Cynthia GATTO, Appellant–Plaintiff,

v.

**ST. RICHARD SCHOOL, INC., d/b/a St. Richard's School, St. Richard's School Foundation Board of Directors, David Peerless, Larry Wechter, Jan Wechter, Robert Greising, and Midge Greising, Appellees–Defendants.**

No. 49A05–0201–CV–014.

Court of Appeals of Indiana.

Aug. 19, 2002.

Publication Ordered Aug. 27, 2002.

Alan M. Hux, Kristina Keener Yeager, Kortepeter McPherson Hux Freihofer & Minton, Indianapolis, IN, Attorneys for Appellant.

Thomas E. Wheeler, II, Locke Reynolds LLP, Indianapolis, IN, Attorney for Appellees.

## OPINION

BAKER, Judge.

Appellant-plaintiff Cynthia Gatto appeals the trial court's grant of summary judgment in favor of appellees-defendants St. Richard's School, Inc., d/b/a St. Richard's School, St. Richard's School Foundation Board of Directors, David Peerless, Larry Wechter, Jan Wechter, Robert Greising, and Midge Greising (collectively, St. Richard's). Determining that the trial court properly granted summary judgment and denied Gatto's claims of breach of contract, tortious interference with contract, and defamation, we affirm.[1]

## FACTS

The facts viewed in a light most favorable to Gatto indicate that St. Richard's is a private Episcopal school with students in grades kindergarten through eight. Peerless, Headmaster of St. Richard's, hired Gatto for the position of Middle School Head. At the time of her hiring on July 31, 1998, she signed a one-year contract for the 1998–99 school year. Gatto's responsibilities included disciplining students, insuring that the curriculum was administered properly, and attending after-school student events.

According to Gatto, in early October 1998, Peerless informed her that she was "brusque" with people. Appellant's App. p. 118. His comment was part of a brief discussion[2] about her job performance in

1. Gatto's breach-of-contract claim was brought against St. Richard's School, Inc., and the St. Richard's School Foundation Board of Directors. Appellant's App. p. 5. Her claim for tortious interference with contract was brought against the Wechters and Greisings. Appellant's App. p. 6. Gatto's claim for defamation was leveled against Peerless, St. Richard's School, Inc., and the

St. Richard's School Foundation Board of Directors. Appellant's App. p. 7.

2. St. Richard's asserts that Peerless composed a memo detailing the course and content of the October discussion, a memo the school alleges was given to Gatto shortly thereafter. Appellees' Br. p. 4. Gatto counters that the memo was composed months after the October discussion and did not surface until after

which he also compared her to another St. Richard's employee who had a reputation for being "very brusque, very short, and very intimidating." Appellant's App. p. 118. A month after this brief discussion, Peerless received a letter from a parent complaining about Gatto's treatment of her son. She accused Gatto of being "arbitrary, self-righteous and willing to be untruthful to protect" herself. Appellees' App. p. 72. Gatto admitted having several altercations with this parent that seemed to "snowball," including a verbal confrontation in Gatto's office and hanging up on the parent during a phone conversation. Moreover, there was undisputed evidence of conflicts between Gatto and other parents and staff.

In March 1999, Peerless conducted a formal evaluation of Gatto's job performance. Along with reviewing her positive contributions to the school, Peerless cited job responsibilities in which Gatto needed to show improvement:

> There have been a number of times when details have not been followed up on, or communicated by you, when necessary. Covering a detention supervision, telling me that you wanted me in a Student Council meeting, realizing the conflict between the NCAA and Kathleen's rehearsal are all examples. There are a great number of different events and issues that are interweaving or occurring at the same time. It is important that you find a way to manage all these. Perhaps noting them in an expanded schedule, referring regularly to a list are possible helps.
>
> . . . .
>
> The two major growth areas that I want you to focus on are:

> a. Keeping open to other people so that communication can be positive. You need to avoid conveying negative emotions or defensiveness that close[s] communication or escalate[s] a conflict. Be careful of the words that you use. Don't be too blunt.
>
> b. Make sure that details don't get overlooked and all information and decisions are shared as needed in as timely a way as possible.

Appellees' App. p. 76–77. Two weeks after presenting Gatto with her evaluation, Peerless offered her a contract for the 1999–2000 school year, which she signed.

However, Gatto's handling of an extracurricular activity in April 1999 spawned additional criticism of her job performance. It is undisputed that Gatto was responsible for insuring that an annual spring dance would be adequately chaperoned. Her task was made more difficult by the scheduling of a surprise party for Peerless on the same night. The dance included students from St. Richard's and other area middle school students. She arranged for her nineteen-year-old son, his girlfriend (18), a student's older sister (17), and the sister's boyfriend (18) to chaperone a dance where roughly eighty students from the sixth, seventh, and eighth grades were expected to attend.

Given that the school's neighborhood had been repeatedly vandalized over the years and the school itself had been broken into the day before, there were increased concerns about security for the dance. Although the sponsoring church of St. Richard's employs a security guard, the guard is stationed in the south parking lot and does not monitor the school or gym

---

the present litigation was underway. Appellant's Br. p. 4. Though the existence of the memo is not a material fact in our disposition of this appeal, we construe the facts and the reasonable inferences drawn from those facts in a light most favorable to Gatto, the non-moving party. *See Butler v. City of Peru,* 733 N.E.2d 912, 915 (Ind.2000).

area unless asked to do so. According to Gatto, "I did not ask if there was a parent going to the dance. Nor did I check to see if there was security scheduled for the dance." Appellees' App. p. 84.

When parents arrived to bring their children to the dance, some became upset that no security was present and that no parents were acting as chaperones. Because of concerns about inadequate supervision, three parents decided to remain at the dance. When Gatto eventually arrived at the dance after the conclusion of the surprise party, an angry parent confronted her. Another parent who had remained at the dance later said that Gatto should be fired for the lack of supervision at the dance. Referring to the parent's wish that she be fired, Gatto admitted, "This was a good way to jump on the bandwagon. This was the only thing that I had done that would merit criticism like that." Appellees' App. p. 60.

On May 21, 1999, Peerless and St. Richard's Personnel Policy Committee met to discuss Gatto's job performance. Peerless had already decided that Gatto's employment should be terminated, and the committee concurred with his decision. A few days later Peerless met with Gatto to notify her of the termination, explaining that she was not a good fit for the school. In a letter dated May 26, Gatto challenged the decision and argued that she was not given any reasons for her termination.

To inform parents of five personnel changes for the upcoming school year—including Gatto's—Peerless and the president of the Board of Directors sent a two-page letter dated June 4. The only portion addressing Gatto's employment status read:

> Mr. Peerless and the Personnel Policy Committee of the Board have decided that in the best interest of the Middle School program, Dr. Gatto should not return next year. This decision was the conclusion of a normal personnel process for these matters. The School's policy in evaluating any employee is to treat the details of such discussions in confidence.

Appellees' App. p. 120.

Within seven months of the letter, Gatto filed a three-count complaint alleging, in part, that St. Richard's breached her employment contract when it terminated her employment. Gatto also brought a claim for tortious interference with contract against Larry and Jan Wechter and against Robert and Midge Greising, parents of students who attended St. Richard's. Her third and final count alleged that the Board of Directors and the school defamed her by sending. the June 4 letter to the school's parents. St. Richards responded by filing a motion for summary judgment, which the trial court ultimately granted on all counts. Gatto now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

■ The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Owens Corning Fiberglass Corp. v. Cobb*, 754 N.E.2d 905, 908 (Ind.2001). Summary judgment is appropriate only if the pleadings and evidence sanctioned by the trial court show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). The review of a summary judgment motion is limited to those materials designated to the trial court. Ind. Trial Rule 56(H); *Rosi v. Business Furniture Corp.*, 615 N.E.2d 431, 434 (Ind.1993). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning*, 754 N.E.2d at 909.

## II. Gatto's Claims

### A. Breach of Contract

■ The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *Shumate v. Lycan*, 675 N.E.2d 749, 753 (Ind.Ct.App.1997), *trans. denied.* Gatto argues that genuine issues of material fact exist regarding whether St. Richard's breached her employment contract by failing to comply with the process for termination. In Gatto's employment contract, the termination clause reads as follows:

> **RIGHT TO TERMINATE:** This contract may be terminated by the School upon a determination by the School, in its sole discretion that a reasonable cause exists to terminate the contract. The Faculty Member will receive written notice of termination. Employee shall be paid through the effective date of termination.

Appellant's App. p. 20.

### 1. "Identity of the School"

■ She first contends that there is a genuine issue of material fact regarding the "identity of the 'School'" within the meaning of the contract. Appellant's Br. p. 13. The contract specifically defines the "School" as St. Richard's School Foundation, Inc. Appellant's App. p. 20. According to Gatto, Peerless and the School are not "interchangeable," and, therefore, Peerless had no contractual authority to determine whether reasonable cause existed to terminate her. Appellant's Br. p. 14.

The undisputed facts, however, show that the school delegated to Peerless the authority to hire and fire employees. His own contract with the School makes this delegation explicit:

> Additionally, as Head and the educational operating and administrative leader of St. Richard's, you will have general supervision and management over all aspects of school operations, as well as all subsidiary activities sponsored by the School and other duties assigned by the Board of Directors. Included in the foregoing, by way of illustration and not limitation, are preparation of the annual budget and *the engagement, termination and delineation of the duties of all administrative, faculty and staff employees, all of whom shall be responsible to, and report to you.*

Appellees' App. p. 29 (emphasis added). On behalf of the school, Peerless hired Gatto and signed her employment contract. Moreover, Peerless was responsible for evaluating Gatto's performance, formally and informally. Exercising his delegated authority, Peerless fired Gatto.

■ Gatto makes much of the fact that St. Richard's is a "separate entity" from Peerless. Appellant's App. p. 16. We agree that the St. Richard's and Peerless are separate metaphysical entities. But one entity (a principal) may delegate its authority to another entity (an agent). *See Dept. of Treasury v. Indianapolis Brewing Co.*, 108 Ind.App. 259, 265, 25 N.E.2d 653, 655 (1940) ("Generally speaking, an agent is one who, by the authority of another, undertakes to transact some business or manage some affairs on account of such other, and to render an account of it.").

■ Gatto also attempts to create a genuine issue of material fact by asserting that the school board ultimately terminated Peerless's contract some time after he had fired her. From his termination, she infers that the school board was required to terminate all employee contracts. In addition to the clear delegation of authority in Peerless's contract to terminate employees, two other factors make her inference unreasonable. First, his own contract reveals that he was responsible to the school board for the performance of his duties. Natural-

ly, the school board would determine whether he carried out those responsibilities, instead of expecting Peerless to fire himself if he concluded after careful evaluation that he was not performing his work in accord with the school board's expectations. Second, Gatto has failed to disclose any instance where the school board fired an employee other than Peerless, the school board's chief executive officer.

Gatto attempts to create a separate issue by arguing that a genuine issue of material fact exists as to whether St. Richard's itself—rather than Peerless—made a determination that reasonable cause existed to fire her. Her argument is redundant: the school delegated authority to terminate employees to Peerless. In other words, the school acted through its agent, Peerless, when she was fired.

### 2. "Written Notice"

■ Gatto's contract provides for post-termination notice: "The Faculty Member will receive written notice of termination." Appellant's App. p. 20. She contends that the school breached her contract by failing to provide post-termination notice. St. Richard's concedes that there is a dispute regarding whether Gatto received written notice of her termination. Appellees' Br. p. 21. However, the school argues that even if Gatto did not receive written notice of her termination, such fact would not constitute a breach as a matter of law.

We were confronted with similar circumstances in *Lewis v. Charles A. Beard Memorial School Corp.*, 657 N.E.2d 180 (Ind. Ct.App.1995), *trans. denied*. There, the school corporation decided not to renew a nonpermanent teacher's contract for the following year. *Id.* at 181. The teacher sued the school board because she was not afforded a post-termination conference as required by statute. *Id.* We held that the conference was not a condition precedent to the school board's refusal to renew the

teacher's contract. *Id.* at 184. The statute made clear that the conference was to be held after the nonrenewal decision was made. *Id.* Because the school board did not violate a condition precedent in refusing to renew the teacher's contract, she was not entitled to damages from the nonrenewal decision. *Id.*

Here, even if we accept as true the assertion that Gatto did not receive written notice of her termination, summary judgment is still appropriate. The school was not contractually required to provide written notice before terminating Gatto's employment. Written notice, in other words, was not a condition precedent to terminating Gatto's employment contract. Moreover, Gatto has not shown how the lack of written notice harmed her. As a result, the school's failure to give written notice will not support a breach-of-contract claim. *See id.*

### 3. "Reasonable Cause"

■ Gatto's final argument on the breach-of-contract claim challenges the existence of reasonable cause to fire her. She claims that reasonableness is always a question for the fact-finder incapable of resolution on summary judgment.

■ On the contrary, when a party is given the exclusive contractual authority to determine reasonableness, there is no need for resort to a fact-finder's second-guessing. *See Ferrell v. Dunescape Beach Club Condos., Phase I, Inc.*, 751 N.E.2d 702, 711 (Ind.Ct.App.2001). In *Ferrell*, a condominium association was contractually entitled to make certain reasonable repairs to parts of the owner's condominium. *Id.* Ferrell refused the association access to her apartment for the repair. *Id.* at 706. In response, the association brought a complaint for declaratory judgment and requested summary judgment in its favor arguing that it was entitled to access to Ferrell's condominium to make reasonable repairs. *Id.*

The trial court granted the association summary judgment, and the owner appealed arguing that the issue for reasonableness was always for the jury. We held:

> [B]ecause the assessment of the reasonableness of repairs was within the exclusive province of the [association] and not subject to challenge under the plain and ordinary meaning of Dunescape's Bylaws, there was no need, as Ferrell urges, to proceed with a factual determination on the issue of reasonableness.

*Id.* at 711. This court "discern[ed] no material question of fact on the issue of reasonableness." *Id.*

In the instant case, St. Richard's reserved to itself exclusive authority to terminate Gatto's employment. The contract provides that the school makes such reasonable cause determinations "in its sole discretion." Appellant's App. p. 20. In other words, because the assessment of reasonable cause was within the exclusive province of the school, and not subject to challenge under the plain and ordinary meaning of the employment contract, there is no need to proceed with a factual determination on the issue of reasonableness. *See Ferrell,* 751 N.E.2d at 711. Therefore, St. Richard's was entitled to summary judgment on Gatto's breach-of-contract claim.

### B. *Tortious Interference with Contract*

Gatto next claims that the Wechters and Greisings tortiously interfered with her contractual relationship with the school. Five elements are necessary to support a claim for tortious interference with contract:

> [1] existence of a valid and enforceable contract, [2] defendant's knowledge of that contract, [3] defendant's intentional inducement to breach that contract, [4] the absence of justification, and [5] damages resulting from the breach.

*Nat'l City Bank, Ind. v. Shortridge,* 689 N.E.2d 1248, 1252 (Ind.1997) (citing *Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1235 (Ind.1994)). Here, St. Richard's did not breach Gatto's contract. Thus, as a matter of law, Gatto may not succeed on a claim for tortious interference with contract. The trial court did not err in granting the school summary judgment on this claim.

### C. *Defamation*

Gatto's final contention is that the June 4 letter sent by Peerless and the school board president was defamatory. Gatto maintains that the elements of defamation in this case are: "(1) communication with a defamatory imputation; (2) malice; (3) publication; and (4) damages." Appellant's Br. p. 27 (citing *Furno v. Citizens Ins. Co. of Am.,* 590 N.E.2d 1137, 1141 (Ind.Ct.App.1992)). Given the four separate opinions in our supreme court's most recent decision addressing defamation, it is not clear that actual malice is the standard of fault where the plaintiff is a private figure *and the matter is not a public or general concern.*[3] Because resolution of

---

3. *See Journal–Gazette Co. v. Bandido's, Inc.,* 712 N.E.2d 446 (Ind.1999) (2–1–2 opinion). The five justices of our supreme court fell into three main camps spread over four separate opinions. (Chief Justice Shepard and Justice Dickson each signed the other's dissent.) First, the lead opinion (Justices Sullivan and Selby) expressed the view that actual malice is the standard of fault "in matters of public or general concern for private individual plaintiffs." *Id.* at 452 (Sullivan and Selby, JJ.). The lead opinion said nothing about suits where the matter is one of nonpublic concern. Second, "[r]estricting the actual malice requirement to publications on subjects of public concern," according to Justice Boehm, "will leave the vast majority of the six million Hoosiers for whom Chief Justice Shepard expresses concern subject to a simple negligence standard for defamation." *Id.* at 471 (Boehm, J., concurring). Finally, writing in dissent, Chief Justice Shepard and Justice Dickson contend that negligence is the

this claim does not depend on the standard of fault, we need not resolve which standard is applicable to a lawsuit brought by a private-figure plaintiff involving a matter of nonpublic concern.

 Gatto's claim for defamation fails because the June 4 letter contains no defamatory imputation. "A statement is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Van Eaton v. Fink,* 697 N.E.2d 490, 494 (Ind.Ct.App.1998). Initially, the determination of whether a communication is defamatory is a question of law for the court; it is to be presented to the jury as a question of fact only if the communication is reasonably susceptible to either defamatory or nondefamatory interpretation. *N. Ind. Pub. Serv. Co. v. Dabagia,* 721 N.E.2d 294, 301 (Ind.Ct.App. 1999), *trans. denied.* In making such a determination, the communication is to be viewed in context and given its plain and natural meaning. *Id.*

Addressing employer statements concerning an employee's performance, Professor Smolla offers some common sense suggestions about defamatory meaning:

> Many negative statements concerning an employee's work performance will easily satisfy the requirement of defamatory meaning. Statements alleging fraud or dishonesty, sexual misconduct, alcohol or drug abuse, or simple incompetence will usually qualify. The statements need not be sharply specific. . . .
>
> Courts should nevertheless be alert to the fact that many evaluations are simply too watered down and amorphous to qualify as carrying defamatory meaning. Typical statements such as "he no longer fit in with our plans," or "we felt we needed a change of direction," or we were "looking for new ideas" or a "fresh approach," or we "didn't like the way things were working out" should be normally dismissed as nondefamatory. *The plaintiff may perceive these statements as mere euphemisms for more damning sentiments that the employer has left unsaid, and the plaintiff may very well feel that the stated grounds are irrational or unfair. But the law of defamation must be grounded in what is actually communicated; it is not a forum for trying causes of action based on unfair or arbitrary terminations.* When the employer does not say anything negative to the employee, or to anyone else, beyond the sort of vague and neutral type of statement described above, the defamation count should be dismissed.

Rodney A. Smolla, *Law of Defamation* § 15:16 (2d ed. 1999 & Supp.2002) (emphasis supplied). Regarding the "vague and neutral type of statement," Professor Magruder's proposed remedy is apt: "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better

---

standard of fault applicable to suits involving private-figure plaintiffs whether the matter is of public or private concern. *Id.* at 489 (Dickson, J., and Shepard, C.J., dissenting). However, if a private-figure plaintiff sues a *nonmedia* defendant, it appears Chief Justice Shepard and Justice Dickson would apply a strict liability standard:

> If somebody posts scandalous and defamatory material about a Hoosier on the internet, sending it all over the world, the victim

may gain redress simply by showing that the defamation occurred (and, most likely, by responding effectively to the defense of truth). If a newspaper spreads exactly the same defamatory material, we know from *Gertz v. Welch* [418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)] that the victim will have to show negligence.

*Id.* at 471–72 (Shepard, C.J., and Dickson, J., dissenting).

protection than the law could ever be." Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv. L.Rev. 1033, 1035 (1936).

### 1. No Defamatory Meaning Here

■ With these principles in mind, we turn to the statements of which Gatto complains. The first portion of the June 4 letter directly addresses her employment status:

> Mr. Peerless and the Personnel Policy Committee of the Board have decided that in the best interest of the Middle School program, Dr. Gatto should not return next year. This decision was the conclusion of a normal personnel process for these matters. The School's policy in evaluating any employee is to treat the details of such discussions in confidence.

Appellees' App. p. 120. The second complained-of portion discusses the school's plans to search for a new Middle School Head:

> **Mandate for the Future**
> Within the next few days, Mr. Peerless will assemble a Middle School Advisory Search Committee. The team will consist of two Middle School faculty, two administrators, two Board members with Middle School students, and three Middle School parents. The team will review the job description and expectations of this position, including the vision and mission statements for the Middle School, and continue the important job of building a Middle School based on our core values. The ad hoc team will continue its work until the job is complete.

Appellees' App. p. 120.

It is hard to imagine statements relating to a fired employee being any more sanitized than these. The school said nothing about Gatto's character, work habits, or her interaction with parents and faculty. The school did not insinuate any impropriety or incompetence on Gatto's part. Rather, in the judgment of Headmaster Peerless and the Personnel Policy Committee, Gatto's continued employ was not in the best interest of the school. In this context, the two portions of the letter were not reasonably susceptible to defamatory meaning. *See Dabagia,* 721 N.E.2d at 301. Gatto's defamation claim fails as a matter of law.

### 2. Truth is a Defense

■ Even if the statements could somehow be construed as defamatory, they are nevertheless true. And truth is a complete defense to defamation. *Assocs. Corp. of N. Am. v. Smithley,* 621 N.E.2d 1116, 1119 (Ind.Ct.App.1993). Peerless, it is undisputed, did decide it was in the best interest of the school to fire Gatto. The Personnel Policy Committee, viewing the facts most favorable to Gatto, concurred with his decision. Moreover, Peerless was committed with the responsibility to hire, continually evaluate, and, if necessary, terminate St. Richard's faculty and administrative personnel. It is undisputed that Peerless reevaluated Gatto's job performance after the spring dance debacle. He even went so far as to discuss his decision with the Personnel Policy Committee before firing Gatto. He then fired her. There was nothing abnormal about this process. Finally, there is nothing untrue about a school's expression of a desire to continue building upon core values in the instruction of its youth.

### 3. Common Interest Privilege Applies

■ Again, if one assumed that the statements were defamatory, they were protected by a qualified privilege of common interest. The qualified privilege applies to communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty,

either public or private, either legal, moral, or social, if made to a person having ·a corresponding interest or duty. *Schrader v. Eli Lilly & Co.*, 639 N.E.2d 258, 262 (Ind.1994). The privilege arises out of the necessity for full and unrestricted communication on matters in which the parties have a common interest or duty. *Chambers v. Am. Trans Air, Inc.*, 577 N.E.2d 612, 615 (Ind.Ct.App.1991), *trans. denied.* Whether the qualified privilege protects a statement is a question of law. *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992). This court has held that various communications are protected as privileged, including those between employers and employees, business partners, members of fraternal organizations, creditors

and credit agencies. *See Chambers*, 577 N.E.2d at 615 (citing *Boydston v. Chrysler Credit Corp.*, 511 N.E.2d 318 (Ind.Ct.App. 1987)). We have not had occasion to determine whether a qualified privilege exists regarding a school's communications to parents regarding the employment status of faculty members or administrative personnel.

■ Parents and schools have a "corresponding interest" in the free flow of information about administrators and faculty members. We are in agreement with many of our sister states that have recognized the common interest privilege under similar circumstances.[4] The protection afforded this privilege, however, may be lost upon a showing that it was abused.

4. *See Sewell v. Brookbank*, 119 Ariz. 422, 581 P.2d 267, 270, 271 (App.1978) (refusing to "allow school officials to shield the incompetent teacher and thus defeat the legitimate interest of the parents in their children and the school system"); *Martin v. Kearney*, 51 Cal.App.3d 309, 124 Cal.Rptr. 281, 283 (1975) ("As parents of school children, defendants were interested persons directing their communications to other interested persons, the school officials."); *Hoover v. Jordan*, 27 Colo. App. 515, 150 P. 333, 334 (1915) (holding that parents' petition to school board charging teacher as incompetent and immoral was protected under the common interest privilege); *Nodar v. Galbreath*, 462 So.2d 803, 809 (Fla. 1984) ("The remarks of [a student's father], addressed in person to a school board at a school board meeting concerning the curriculum and instruction in an English class at a public high school in which his son was enrolled and his son's difficulties with the class clearly came within the scope of the privilege based on mutuality of interest of speaker and listener."); *Desselle v. Guillory*, 407 So.2d 79, 82 (La.Ct.App.1981) (determining the existence of the common interest privilege because "[t]he interests shared by each of these persons were to protect the welfare of their children at school and to provide good teachers in the public schools"), *writ denied*, 412 So.2d 83 (La.1982); *Swenson–Davis v. Martel*, 135 Mich.App. 632, 354 N.W.2d 288, 291 (1984) (holding that father's letter to principal accusing teacher of unprofessional behavior

and incompetency was protected by common interest privilege because of father's "legitimate concern with his child's education"); *Elstrom v. Indep. Sch. Dist. No. 270*, 533 N.W.2d 51, 55 (Minn.Ct.App.1995) (holding common interest privilege applicable to protect statements documenting teacher's "culturally insensitive" remarks in classroom); *Segall v. Piazza*, 46 Misc.2d 700, 702, 260 N.Y.S.2d 543 (N.Y.Sup.Ct.1965) (applying defense of privilege in defamation action brought by teacher against a student's parent); *Lail v. Madisonville Child Care Project, Inc.*, 55 Ohio App.3d 37, 561 N.E.2d 1063, 1066 (1989) (holding executive director's statements protected by common interest privilege where she communicated the facts of a teacher's physical abuse of a child to board of directors of a day care center and to the abused child's parent); *Uken v. Sloat*, 296 N.W.2d 540, 543 (S.D.1980) ("It does not take an exercise in deep logic to conclude that parents of children attending school in a district under supervision of [the school superintendent] are interested individuals as regards [school superintendent]'s effect on that school district."); *Hitter v. Bellevue Sch. Dist. No. 405*, 66 Wash.App. 391, 832 P.2d 130, 135 (holding privileged principal's statement to mother that a teacher had inappropriately touched her daughter), *review denied*, 120 Wash.2d 1013, 844 P.2d 435 (1992).

*Schrader,* 639 N.E.2d at 262. The privilege is abused when: (1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth. *Id.*

The statements here were communicated to apprise Middle School parents of St. Richard's decision to terminate Gatto's contract. Parents have an interest in the employment status of teachers and administrative personnel to whom they entrust their children. This interest extends to whether the particular employee was fired, was refused a contract renewal, retired, or quit. In sum, the common interest privilege protected statements concerning Gatto in the June 4 letter.

Gatto argues that St. Richard's abused the privilege because Peerless and Dorfman knew that the letter contained false statements. Because the statements were true, Gatto's contention on these grounds fails.

### CONCLUSION

In sum, we affirm the summary judgment in favor of St. Richard's on all counts of Gatto's complaint. First, the school did not breach Gatto's employment contract. Second, the claim for tortious interference with contract is defeated because there was no breach. Finally, the Gatto's claim for defamation fails because the statements in the June 4 letter: (1) contained no defamatory meaning; (2) were true; and (3) were protected by the common interest privilege.

Judgment affirmed.

DARDEN, J., concurs.

SULLIVAN, J., dissents with opinion.

SULLIVAN, Judge, dissenting.

I respectfully dissent with respect to Part II A. 1.

The contract between Peerless and the School is at odds with the contract between Gatto and the School. Gatto was not a party to the Peerless–School contract. She is, therefore, entitled to rely upon her own contract with regard to the ultimate authority for termination of that contract. It specifically stated that termination is a determination to be made upon reasonable cause in the sole discretion of the School. It does not contemplate that such authority may be delegated to a designee such as the Headmaster.

Under Part II A. 3. of the majority opinion, this fact would appear to be acknowledged. In treating the issue of whether the reasonableness of a contract termination is a question appropriate for summary judgment, the majority states:

"... St. Richard's reserved to itself exclusive authority to terminate Gatto's employment. The contract provides that the school makes such reasonable cause determinations 'in its sole discretion'.... In other words, because the assessment of reasonable cause was within the exclusive province of the school ..." Op. at 922.

I fail to understand how the School may delegate its *exclusive* authority to another employee of the School.

For these reasons, I respectfully disagree with the majority's conclusion that Peerless possessed delegated authority to fire Gatto.[5]

---

**5.** In this regard I must acknowledge that Gatto's contract was executed by Peerless on behalf of St. Richard's School Foundation. It was not signed by the President of the Board of the Foundation or some other authorized member of the Board. Appellee's Appendix at 068. That fact does not, however, in my estimation, alter the manner in which and by whom the contract could be terminated. Although Peerless may have been the agent of the School with reference to the hiring of Gatto he did not thereby and in derogation of the contract itself become the agent of the

927

Although I concur in the affirmance of the summary judgment with respect to Gatto's claim for defamation, I would reverse the summary judgment with respect to the breach of contract and tortious interference with contract claims and would remand for further proceedings as to those two counts of the complaint.

## ORDER

This Court having heretofore handed down its decision in this case on August 19, 2002, marked Memorandum Decision, Not for Publication;

The Appellees, by counsel, having thereafter filed their Motion to Publish Decision, alleging therein that the decision both clarifies existing law and is a matter of substantial public importance in that it clarifies the application of the defamation standard in the context of school communications with parents and in particular establishes a new rule of law, namely, the adoption of the common interest privilege to protect communications between schools, parents and taxpayers.

The Court having examined said Motion and being duly advised, now finds that said Motion should be granted and this Court's opinion in this appeal should now be ordered published.

IT IS THEREFORE ORDERED as follows:

1. The Appellees' Motion to Publish Decision heretofore handed down in this cause on August 19, 2002, marked Memorandum Decision, Not for Publication, is now ordered published.

School with reference to termination of the contract.