# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**BARRY A. MACEY**
**QUINCY E. SAUER**
Macey Swanson and Allman
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**JULIA BLACKWELL GELINAS**
**MAGGIE L. SMITH**
Frost Brown Todd LLC
Indianapolis, Indiana

**JAMES W. RILEY, JR.**
**STEPHANIE S. CHAUDHARY**
Riley Bennett & Egloff, LLP
Indianapolis, Indiana

FILED

Dec 11 2013, 9:27 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CAROL SPARKS DRAKE, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 29A02-1302-CT-152 |
| | ) | |
| THOMAS A. DICKEY, CRAIG | ) | |
| ANDERSON, CHARLES E. PODELL, | ) | |
| and DUKE REALTY CORPORATION, | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable J. Richard Campbell, Judge
Cause No. 29D04-0908-CT-2767

**December 11, 2013**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

Carol Sparks Drake appeals the trial court's entry of summary judgment for Thomas A. Dickey, Craig Anderson, Charles E. Podell, and Duke Realty Corporation (collectively, "Duke Realty") on Drake's claim that Duke Realty intentionally interfered with her partnership agreement with the law firm of Parr Richey Obremskey & Morton ("Parr Richey").[1] Drake and Duke Realty raise three issues[2] for our review, which we consolidate and restate as follows:

1. Whether there is a genuine issue of material fact as to whether Duke Realty intentionally induced Parr Richey to terminate Drake's partnership agreement.

2. Whether, if Duke Realty interfered with Drake's partnership agreement, there is a genuine issue of material fact as to whether such interference was justified.

We affirm in part, reverse in part, and remand for further proceedings.

---

[1] On October 5, 2012, the trial court granted Duke Realty's motion to "Prohibit Public Access to Confidential Information" and excluded from public access the parties' filings in the trial court. Appellant's App. at 117. On appeal, both parties requested that this court maintain the confidentiality of the proceedings pursuant to Indiana Administrative Rule 9(G)(1.2), and our motions panel granted that request. The writing panel may reconsider a ruling of the motions panel. We have endeavored to maintain confidentiality on appeal and, thus, have omitted the names of nonparties. But an appellate judicial opinion that both decides the case and articulates the law requires consideration of the underlying facts. Thus, we have included a number of facts derived from confidential records in this opinion because "we deem such information to be public as essential to the resolution of the litigation and appropriate to further the establishment of precedent and the development of the law." Recker v. Review Bd. of Ind. Dep't of Workforce Dev., 958 N.E.2d 1136, 1138 n.4 (Ind. 2011) (citing Ind. Administrative Rules 9(G)(3) and 9(G)(4)(d)).

[2] Duke Realty presents an alternative argument that was rejected by the trial court, namely, that its conduct was motivated by a legitimate business purpose and, therefore, was justified as a matter of law. Although Duke Realty has not properly denominated this argument as a cross-appeal issue, see Ind. Appellate Rule 9(D), Duke Realty challenges the trial court's ruling that there are genuine issues of material fact as to whether Duke Realty's conduct was justified. Because Duke Realty's argument is fully developed, and Drake answers the argument in her reply brief, in Issue Two we address the argument as if it were raised as an issue on cross-appeal.

Drake is an attorney who joined Parr Richey in 1983 and was a partner in the firm for twenty-one years, from 1985 to 2006. In 2003, Duke Realty, a client of Parr Richey, announced its intention to construct a mixed-use development (the "Anson Project") on land adjacent to real property owned by Drake in Boone County.[4] Duke Realty offered to purchase Drake's property, but she declined to sell it. Shortly thereafter, realizing an apparent conflict of interest between Drake and Duke Realty, Parr Richey suspended its representation of Duke Realty with respect to the Anson Project. In August of 2004, Drake and Duke Realty entered into a confidential Land Use Agreement that limited how Duke Realty could develop its land near Drake's property. After execution of the Land Use Agreement, Parr Richey resumed its representation of Duke Realty on the Anson Project in February of 2005.

Drake and Duke Realty had numerous disagreements following execution of the Land Use Agreement. In October of 2005, Drake applied to the Lebanon Community School Corporation to be its appointee on the Boone County Area Plan Commission. Her application prompted a representative of Duke Realty to contact a Parr Richey partner and "tell[] him that if [Drake] did not withdraw that application . . . he would not . . . represent Duke [Realty] again." Appellant's App. at 211. At that partner's

---

[3] We decline Duke Realty's request that we hold that Drake waived her appeal for having not included all the necessary documents in her Appellant's Appendix.

[4] The property, which Drake owns with her husband, consists of approximately forty-six acres.

subsequent request, Drake withdrew her application for the school board appointment to the Boone County Area Plan Commission.

Drake's disputes with Duke Realty culminated on October 25, 2006. Drake wrote a letter to Duke Realty in which she "outlined [Duke Realty's] breaches of the Land Use Agreement and . . . requested that [Duke Realty] abide by the agreement." Id. at 9. On November 7, 2006, Duke Realty, through Dickey, Anderson, and Podell, met with two partners of Parr Richey at Duke Realty's offices. Duke Realty informed the Parr Richey partners that, "[i]f Drake[] formally intervene[s] or protest[s] or either party files a complaint on the [Land Use Agreement, Parr Richey's] relationship with [Duke Realty] will be terminated," id. at 99 (emphasis removed), and that, "if [Drake] file[d] anything or remonstrate[d], whatever relationship . . . Duke [Realty] has had with Parr Richey will be ended," id. at 49. The meeting "was[ not] a very long meeting." Id. One partner's notes about the meeting stated that it was "in [Parr Richey's] best interest to see if this can be resolved." Id. at 99. Prior to Duke Realty's meeting with the two Parr Richey partners, "none of the partners had indicated in any way that [Drake's] future with the firm was in any jeopardy," and Drake "did not sense a change in tenor with respect to the other partners' attitude[s] towards [her.]" Id. at 9.

However, on November 15, shortly after Duke Realty had issued its ultimatum to Parr Richey, the two partners who had met with Duke Realty described their meeting to the other partners, including Drake. After that meeting, one Parr Richey partner told Drake that "the situation with [Duke Realty] was a problem that needed to go away" and that "this could be your job . . . if you don't sell your farm to Duke Realty." Id. at 10. A

4

couple of weeks later, two other partners told Drake that she "would be terminated from the partnership unless the farm was sold to Duke Realty." Id. at 11. Drake refused to sell her property to Duke Realty. On December 9, the Parr Richey partners held a meeting, reconstituted their partnership agreement, and removed Drake as a partner.

On August 7, 2009, Drake filed suit against Duke Realty for tortious interference with her partnership agreement with Parr Richey. Duke Realty moved for summary judgment, which the court granted on January 18, 2013. In granting Duke Realty's motion for summary judgment, the trial court stated, in relevant part:

> The issue for the Court to decide is whether [Drake's] argument is a reasonable inference based upon the facts. It is obvious that [Duke Realty] pressured Parr Richey with the intent that Parr Richey would pressure [Drake] to reach an agreement with Duke Realty over her real estate dispute. But it is not obvious at all that [Duke Realty's] intent was to pressure Parr Richey to terminate [Drake] if she did not reach an agreement. . . .
>
> [Duke Realty's] actions can be best characterized as using Duke Realty's clout . . . to interfere with [Drake's] personal legal claim against Duke Realty. There are facts to support [Drake's] claim that Parr Richey threatened her with termination if she did not settle her dispute with Duke Realty. Also, there is no doubt that [Duke Realty] did contribute to [Drake's] termination as a partner with Parr Richey. But there are no facts to suggest that [Duke Realty's] intent was for Parr Richey to terminate [Drake].

Appellees' App. at 11 (emphases added). This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review & Overview

Drake appeals the trial court's entry of summary judgment for Duke Realty. Our standard of review for summary judgment appeals is well established:

5

When reviewing a grant of summary judgment, our standard of review is the same as that of the trial court. Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment a matter of law." In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

Dreaded, Inc. v. St. Paul Guardian Ins. Co., 904 N.E.2d 1267, 1269-70 (Ind. 2009) (citations omitted).

The trial court's order on summary judgment included a statement of reasons for the trial court's decision. While such statements aid our review by allowing us to know the trial court's rationale, we are not bound by them. See Great Lakes Transfer, LLC v. Porter Cnty. Highway Dept., 952 N.E.2d 235, 241 (Ind. Ct. App. 2011). In other words, the trial court's explanation notwithstanding we employ our usual de novo standard of review for cases disposed of by summary judgment. Id.

Here, Drake claims that Duke Realty tortiously interfered with her partnership agreement with Parr Richey. "Indiana has long recognized that intentional interference with a contract is an actionable tort, and includes an intentional, unjustified interference by third parties with an employment contract." Winkler v. V.G. Reed & Sons, Inc., 638 N.E.2d 1228, 1234 (Ind. 1994) (citing Bochnowski v. Peoples Fed. Sav. & Loan, 571 N.E.2d 282, 284 (Ind. 1991)). This tort reflects the public policy that contract rights are property and, under proper circumstances, are entitled to enforcement and protection

6

from those who tortiously interfere with those rights. Id. Tortious interference with a contractual relationship consists of the following elements: (1) that a valid and enforceable contract exists; (2) the defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach. Id. at 1235. On appeal, the parties dispute only the third and fourth elements, and they agree that Drake has met her burden to show a genuine issue of material fact on the remaining elements. We address each issue in turn.

### Issue One: Intentional Inducement

Drake first contends that the designated evidence shows a genuine issue of material fact on the question of whether Duke Realty intentionally induced the Parr Richey partners to remove her from the partnership. The trial court concluded that summary judgment on this issue was appropriate on the theory that, while Duke Realty used its "clout" with Parr Richey to intervene on Duke Realty's behalf in its dispute with Drake, "it is not obvious" that Duke Realty intended that Parr Richey remove Drake as a partner. Appellees' App. at 11. We conclude, however, that the designated evidence demonstrates a genuine issue of material fact as to Duke Realty's intent.

This issue is controlled by our Supreme Court's opinion in Bochnowski. The relevant facts of Bochnowski are as follows:

> Appellant Thomas Bochnowski left his employment with Peoples Service Agency, a subsidiary of Peoples Federal Savings and Loan Association, in the fall of 1981. [Thomas] had worked in the area of real estate appraisal, but because Peoples Service was phasing out its real estate appraisal activities, [Thomas] was working predominantly in the area of insurance.

7

In order to get back into the real estate appraisal business, [Thomas] went to work for Vernon Lee of Vernon Lee and Associates. In March of 1982, [Thomas's] brother, Michael Bochnowski, left Peoples Service and started his own insurance and real estate appraisal business called Bochnowski Agency, Inc. The two brothers were partners in this agency.

In May of 1982, David Bochnowski, President of Peoples Service Agency, Chief Executive Officer and Director of Peoples Federal, and a cousin to [Thomas] and Michael, wrote a letter to Vernon Lee informing Lee of [Thomas's] involvement in the Bochnowski Agency. Peoples Federal relied upon Vernon Lee to do a good deal of its real estate appraisal work. As a condition of his employment with Lee and Associates, [Thomas] had agreed not to accept any outside appraisal work. [David's] letter informed Vernon Lee that Peoples Federal would terminate its relationship with Lee and Associates unless it received Lee's personal assurance that [Thomas] would not be involved in any way with appraisals assigned by Peoples Federal to Lee and Associates. [David] feared that because [Thomas] had access as an appraiser for Lee and Associates to Peoples' customer lists, he would be able to utilize these lists to steal insurance clients from Peoples for the Bochnowski Agency. Lee and [David] temporarily resolved this issue through an agreement whereby Lee agreed that [Thomas] would no longer be allowed to do any appraisal work involving Peoples Federal. Nonetheless, in the spring of 1982, Peoples Service Agency initiated litigation against [Thomas].

Lee would occasionally inquire as to the status of this litigation involving [Thomas]. In December of 1983, [David] urged Lee to do whatever he could do to get the parties together to resolve the dispute. Subsequently, at Lee's suggestion, the parties to this litigation held two meetings in early January of 1984 in an effort to settle this matter. At the conclusion of these meetings, all parties were optimistic that a settlement had been reached and that only minor details and legal formalities remained. [Thomas] reported this to Lee and asserted that an agreement had been reached and its final conclusion was imminent. On June 29, 1984, however, [David] wrote a letter to Lee in which he stated that a settlement had not been reached. In this letter, David also asserted that [Thomas] was again doing Peoples Federal appraisal work in violation of their agreement.

This letter prompted a meeting between Lee, [Thomas,] and [David]. At the conclusion of this meeting, an exasperated Vernon Lee issued an ultimatum to [Thomas]. Lee informed [Thomas] that he had two options: He could resolve the matter by settling the litigation with Peoples Federal or he could terminate his employment with Lee and Associates. Lee gave

8

[Thomas] two weeks to make his decision. The result was that at the end of this two-week period, Lee and [Thomas] severed their employment relationship.

In September of 1984, [Thomas] filed suit against Peoples Federal Savings and Loan Association . . . .

571 N.E.2d at 283. The trial court entered summary judgment for Peoples Federal on Thomas's claim for intentional interference with a contract.

On transfer, our Supreme Court reversed the trial court's entry of summary judgment and remanded for a trial. In doing so, the court reasoned in relevant part as follows:

An employee with an at will employment contract must be able to expect that his continued employment depends on the will of his employer and not upon the whim of a third party interferer. We therefore conclude that a claim for tortious interference with an employment relationship can be maintained upon a contract terminable at will. The plaintiff bringing such an action, however, must be prepared to show that the defendant interferer acted intentionally and without a legitimate business purpose.

A review of the trial court record in this case compels us to find that . . . Summary Judgment was inappropriate. . . . [Thomas's] affidavit . . . presents an account of the events surrounding his discharge that differs with the account provided by the depositions of [officers of Peoples Federal]. This conflict presents a genuine issue as to certain material facts.

Further, there are disputes as to the inferences to be drawn from several undisputed facts. . . . Vernon Lee, for example, stated in his deposition that he and [David] discussed the resolution of the litigation between Peoples Federal and [Thomas]. Subsequent to such discussions, Lee suggested to [Thomas] that he get together with various members of the Board of Directors of Peoples Federal and attempt to resolve the matter amicably. After these efforts failed, Lee issued his ultimatum to [Thomas] to either resolve the matter or go elsewhere. [David] was present at the meeting when Lee issued this ultimatum. Various inferences could be drawn from these undisputed facts, as a reasonable trier of fact could find

9

> evidence of a claim for tortious interference with [Thomas's] employment contract.

Id. at 285 (emphases added).

Bochnowski closely parallels this case. First, Drake's designated evidence demonstrates the existence of genuine issues of material fact. As relevant here, the designated evidence shows that Drake had resolved her dispute with Duke Realty when she entered into a Land Use Agreement. The designated evidence also supports the inference that it was Duke Realty's breach of that agreement, together with Duke Realty's threat conveyed to Parr Richey that Parr Richey would lose Duke Realty as a client if Drake sought to enforce the agreement, that caused Parr Richey to remove Drake from the partnership.[5] Because Duke Realty was the summary judgment movant, we must view the designated evidence most favorably to Drake. Dreaded, Inc., 904 N.E.2d at 1270. Applying that standard, we conclude that the designated evidence "presents a genuine issue as to certain material facts." Bochnowski, 571 N.E.2d at 285. Thus, the question remains whether, when Duke Realty demanded of Parr Richey that Drake cease and desist from enforcing her rights under the Land Use Agreement, Duke Realty intentionally induced Parr Richey to remove Drake as a partner without legal justification.

---

[5] Drake was ultimately vindicated in her claim that Duke Realty had breached the Land Use Agreement when the Hamilton Superior Court entered an Agreed Permanent Injunction against Duke Realty. According to the trial court's order, the Land Use Agreement "means exactly what it says" in outlining Duke Realty's restrictions in developing the land around Drake's property. Appellant's App. at 56-70. In addition to enjoining Duke Realty from breaching the terms of the Land Use Agreement, the court released the bond posted by Drake and ordered Duke Realty to pay to Drake more than $50,000 in court costs, attorney's fees, and mediation and expert expenses.

10

Various inferences, which would alter the outcome of this case, can be drawn from the undisputed facts. See id. In Bochnowski, Peoples Federal and Lee had a business relationship, Lee was Thomas's employer, and Peoples Federal and Thomas were in the midst of a dispute. Likewise, Duke Realty and Parr Richey had a business relationship, Parr Richey was Drake's employer, and Duke Realty and Drake were in the midst of a dispute. In Bochnowski, Peoples Federal used its business relationship with Lee to have Lee intervene in Peoples Federal's dispute with Thomas. Here, too, Duke Realty used its business relationship with Parr Richey to have Parr Richey intervene in Duke Realty's dispute with Drake. In Bochnowski, Peoples Federal specifically threatened Lee with the loss of its business if Lee could not personally assure that Thomas "would not be involved in any way with appraisals assigned by Peoples Federal to Lee." Id. at 283. Here, Duke Realty specifically threatened Parr Richey with the loss of Duke Realty as a client if Drake pursued her legal remedies against Duke Realty based on Duke Realty's alleged breach of the Land Use Agreement. And, following the intervention of Peoples Federal and Duke Realty, Thomas and Drake, respectively, lost their jobs. Here, as in Bochnowski, "[v]arious inferences could be drawn" from these undisputed facts, and "a reasonable trier of fact could find evidence of a claim for tortious interference" against Duke Realty following Parr Richey's removal of Drake as a partner. Id. at 285.

We note that, although Drake relies on Bochnowski in her appellate brief, Duke Realty almost completely ignores it.[6] In a footnote in its brief, Duke Realty suggests that

---

[6] In its order on summary judgment, the trial court concluded that Bochnowski was distinguishable because David, as a representative of Peoples Federal, had attended the meeting at which

11

Bochnowski is inapposite because it involved an employment-at-will contract rather than a partnership agreement.  Duke Realty then asserts:

> it is undisputed that the partnership did not need "cause" to vote [Drake] out of the partnership because reconstitution of the partnership could occur at any time for any reason based upon the vote of a majority of the partners. Parr Richey's decision to reconstitute the partnership thus did not result in any "breach" of its Partnership Agreement with [Drake] and cannot form the basis for an intentional interference with contract claim.

Appellee's Br. at 16 n.11.  In support of this contention, Duke Realty cites Gatto v. St. Richard School Inc., 774 N.E.2d 914, 922 (Ind. Ct. App. 2002).  In Gatto, a teacher sued her school, after the school had terminated her employment, for breach of contract, and she sued two parents for tortious interference with her employment contract.  The teacher's employment contract allowed for her termination "upon a determination by the School, in its sole discretion[,] that a reasonable cause exists to terminate the contract." Id. at 920.  The teacher argued that the school lacked reasonable cause to terminate her employment, but the trial court rejected her argument on summary judgment.  On appeal, we held that "the assessment of reasonable cause was within the exclusive province of the school" and, therefore, there was "no need to proceed with a factual determination on the issue of reasonableness." Id. at 922.  After holding that the school was entitled to summary judgment on the breach of contract claim, this court held that the teacher's tortious interference claim could not stand without a breach of contract. Id. at 922.

---

Lee issued his "ultimatum" to Thomas. See Bochnowski, 571 N.E.2d at 285.  Duke Realty does not defend this purported distinction on appeal, and we do not find it persuasive.

Gatto does not account for the holding in Bochnowski that a claim of tortious interference with a contract can survive summary judgment even where the decision to terminate the employment contract is at the discretion of the employer. Again, in Bochnowski our Supreme Court held that, even if a contract for employment can be terminated by the employer at will, termination due to the unjustified interference of a third party may be tortious. 571 N.E.2d at 285. As the court stated: "An employee with an at will employment contract must be able to expect that his continued employment depends on the will of his employer and not upon the whim of a third party interferer." Id. Likewise, this court has also recognized that, "where a third party's conduct substantially and materially impairs the execution of an employment contract, frustrating an employee's expectations under her contract and making performance of her contractual duties more burdensome, the inducement of breach element of a claim for tortious interference with a contractual relationship is satisfied." Levee v. Beeching, 729 N.E.2d 215, 222 (Ind. Ct. App. 2000).

To the extent that Gatto stands for the proposition that a third party's unjustified interference with an employer's discretion is not a breach of the contract, Bochnowski and Levee hold otherwise. Here, Drake's partnership agreement with Parr Richey is equivalent to an at-will employment agreement since her status as a partner is terminable at will by a majority vote of the partners. Duke Realty's attempt to distinguish the partnership agreement from an employment-at-will contract is an insignificant distinction on these facts. Bochnowski and Levee control.

13

Duke Realty also spends a significant portion of its brief asserting that summary judgment is appropriate because it did not specifically intend to have Parr Richey interfere with Drake's employment. In particular, Duke Realty argues that it is liable only if it specifically intended to have Drake removed as a partner of Parr Richey. This is incorrect. It may be enough that Duke Realty interfered with the partnership agreement for Duke Realty to be found liable. In other words, it is not necessary for Duke Realty to have specifically intended only that Drake be terminated as a partner for Duke Realty to have tortiously interfered with the partnership agreement. The evidence clearly supports the trial court's statement that "there is no doubt that [Duke Realty] did contribute to [Drake's] termination as a partner with Parr Richey." Appellees' App. at 11. Thus, the evidence would support a finding that there is a causal relationship between Duke Realty's conduct and Parr Richey's removal of Drake as a partner of the firm, and that evidence is sufficient to withstand Duke Realty's motion for summary judgment. We note, however, that even where the element of causation has been satisfied, the question of intent remains to be determined.

Further, although Duke Realty is correct that <u>one</u> way to demonstrate an actor's intent to induce another to breach a contract is to show that the actor specifically intended that result, that is not the <u>only</u> way to demonstrate the actor's intent. As the Restatement (Second) of Torts explains:

> The rule stated in this Section is applicable if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition. The rule is broader, however, in its application than to cases in which the defendant has acted with this purpose or desire. It applies also to

14

intentional interference, as that term is defined in § 8A, in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.

The fact that this interference with the other's contract was not desired and was purely incidental in character is, however, a factor to be considered in determining whether the interference is improper. If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.

Restatement (Second) of Torts § 766 cmt. j (1979). And, as stated in § 8A of the

Restatement:

All consequences which the actor desires to bring about are intended . . . . Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness . . . . As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence . . . .

(Emphasis added.)

Thus, Duke Realty's intent may be demonstrated by showing either that it specifically intended to interfere with the partnership agreement or that it acted for another purpose but knew that the interference was certain or substantially certain to occur. See id. § 766 cmt. j. That is, even if Duke Realty did not specifically intend to interfere with the partnership agreement, it may still be liable for an incidental

15

interference when such interference was a necessary consequence of Duke Realty's conduct, whether or not that consequence was desired. Id. However, if the interference was purely incidental to a legitimate interest of Duke Realty's, Duke Realty may be found not liable if that interference was of "such a minor and incidental consequence and so far removed from the defendant's object that as against the plaintiff the interference may be found to be not improper."[7] Id. Our courts have recognized that the Restatement is instructive, and we agree with the Restatement's explanation of intent. See, e.g., Bochnowski, 571 N.E.2d at 284-85 (following Section 766's commentary regarding whether one may be held liable for tortious interference with an employment-at-will contract).

In considering the law and the designated evidence, there is no question that it is for the jury to judge the credibility of the witnesses, weigh the evidence, and determine whether Duke Realty intended to interfere with Drake's partnership agreement. It is also for the jury to determine whether Duke Realty knew that its conduct was certain or substantially certain to interfere with Drake's partnership. See id. at 285. Thus, tortious interference will have been established if the jury determines either that Duke Realty actually intended that its conduct would interfere with Drake's partnership agreement or that it was within the reasonable contemplation of Duke Realty that its conduct would or would likely interfere with the partnership agreement, in which latter case Duke Realty will be deemed by law to have desired that result. The intentional inducement element of

---

[7] We consider Duke Realty's argument that its interference with Drake's partnership agreement was justified under Issue Two.

16

tortious interference may be proven either directly or indirectly and inferentially. We agree with Drake that the trial court's reasoning in its order on summary judgment involved weighing conflicting evidence and drawing inferences from that evidence, both of which are functions reserved for the jury. The trial court erred when it concluded that Drake had failed to present a genuine issue of material fact as to whether Duke Realty intentionally induced Parr Richey to terminate Drake as a partner.

### Issue Two: Whether Duke Realty's Interference Was Justified

Duke Realty also asserts that summary judgment is appropriate because, even assuming that it did interfere with Drake's partnership agreement, it had a legitimate business reason to do so. The trial court rejected that argument as a basis for summary judgment, but Duke Realty contends on appeal that it "had a legitimate business interest in exercising its unfettered right to end its attorney-client relationship with Parr Richey . . . ." Appellees' Br. at 13.[8] In support, Duke Realty notes that "the personal interests of a lawyer cannot 'be permitted to have an adverse effect on the representation of a client,'" id. at 26 (citing Ind. Professional Conduct Rule 1.7(a)(2) cmt. 1, 10), and that one lawyer's conflict of interest is generally imputed to that lawyer's entire firm, see Prof. Cond. R. 1.10(a).

But our Rules of Professional Conduct do not justify a client's tortious behavior toward an attorney. While Duke Realty has an unfettered right to terminate its attorney-

---

[8] In part II.A of its brief, Duke Realty cites, without any discussion, several foreign authorities for support of its conclusion that the Rules of Professional Conduct limit Drake's claim. See Appellee's Brief at 26. One of those authorities is an unpublished decision of a federal appellate court, and another authority is a summary order of the New York Supreme Court, Appellate Division. The two remaining cases involved lawyers bringing suit against other lawyers on facts wholly inapposite from Drake's claim against Duke Realty. As such, we do not consider these foreign authorities.

client relationship with Parr Richey, Duke Realty could have exercised that right without issuing a threat or ultimatum regarding Drake. A client's first-party right to terminate an attorney-client relationship does not include a corresponding third-party right to interfere with an attorney's partnership agreement. As our Supreme Court stated in Bochnowski: "The attempt to force settlement of litigation by inducing a litigant's employer to terminate him if he does not settle the pending litigation does not constitute a legitimate business purpose which would justify interference with [the litigant's] employment contract." 571 N.E.2d at 285.

Moreover, Duke Realty's argument on this issue ignores the designated evidence that is most favorable to Drake, the nonmovant in the summary judgment proceedings, and is contrary to the summary judgment standard. Rule of Professional Conduct 1.10(a) states:

> While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule[] 1.7 . . . <u>unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm</u>.

(Emphasis added.) According to Drake's designated evidence, Duke Realty engaged Parr Richey in three significant contacts about Drake. First, when Duke Realty first sought to purchase Drake's property, Parr Richey suspended its representation of Duke Realty with respect to the Anson Project. But, after Drake and Duke Realty had entered into their confidential Land Use Agreement, Parr Richey resumed its previously suspended representation of Duke Realty. The resumed representation indicates that, after execution

18

of the Land Use Agreement, Drake's personal interest did not "present a significant risk of materially limiting the representation of the client by the remaining lawyers of the firm." Prof. Cond. R. 1.10(a).

Second, notwithstanding resolution of the apparent conflict of interest, Duke Realty used its status with Parr Richey to compel Drake to withdraw her application for a position on the Boone County Area Plan Commission in 2005. And, despite Duke Realty's influence over her partners, following execution of the Land Use Agreement "none of the partners had indicated in any way that [Drake's] future with the firm was in any jeopardy" and Drake "did not sense a change in tenor with respect to the other partners' attitude[s] towards [her]" prior to Duke Realty's November 2007 meeting with the two Parr Richey partners. Appellant's App. at 9.

But this changed after the third contact, the November 2007 meeting. There, Duke Realty did not ask that Parr Richey once again suspend its representation with respect to the Anson Project but instead threatened to terminate all of its business with Parr Richey if Drake sought to enforce her legal rights under the Land Use Agreement. The contemporaneous notes of a Parr Richey partner who attended the November 2007 meeting do not show that Duke Realty expressed concern about a conflict of interest but, rather, state only that Duke Realty had informed the partners that, "[i]f Drake[] formally intervene[s] or protest[s] or either party files a complaint on the [Land Use Agreement,

Parr Richey's] relationship with [Duke Realty] will be terminated." Id. at 99 (emphasis removed).[9]

Again, Duke Realty's argument ignores the fact that it did not simply terminate its attorney-client relationship but, rather, used its status as a Parr Richey client as leverage in its dispute with Drake. A jury might determine that Duke Realty was legitimately concerned with a conflict of interest and that its interference with the partnership agreement was "purely incidental" to that concern. Restatement (Second) of Torts § 766 cmt. j. Or a jury could find that, instead of simply terminating its attorney-client relationship with Parr Richey and obtaining other legal counsel, Duke Realty threatened Parr Richey in reasonable contemplation that Drake's partners would either compel Drake to cease and desist from enforcing the Land Use Agreement or that Drake's partners would remove her from the Parr Richey partnership, either of which outcomes would obviate Duke Realty's purported concern about a conflict of interest.

The designated evidence most favorable to Drake presents a genuine issue of material fact as to whether there was an absence of justification for Duke Realty's interference with the partnership agreement. Duke Realty's dispute with Drake, which was at one time unresolved and open-ended, had been settled and reduced to a single

---

[9] On December 7, 2006, two days before the Parr Richey partners removed Drake from the partnership, representatives of Duke Realty sent a letter to Parr Richey. That letter stated that "it was not [Duke Realty's] intent to encourage the partnership to take any form of action against Ms. Drake in hopes that that would somehow help resolve our issues with the Drakes" and asked whether Parr Richey "thought [it] had a conflict in doing work for [Duke Realty]." Appellant's App. at 100. In depositions, two Parr Richey partners questioned the letter. One characterized it as a "CYA" letter. Id. at 98. The other wrote on a copy of the letter that it was written "in this manner to avoid claims of tortious interference [with] a contract." Id. at 100. It will be for the trier of fact to determine the significance, if any, of this letter.

20

written document, the Land Use Agreement. Thus, in particular, there is a genuine issue of material fact regarding whether Drake's personal interest adverse to Duke Realty "present[ed] a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm." Prof. Cond. R. 1.10(a). And it is for the jury to determine whether Duke Realty's November 2007 meeting with the Parr Richey partners to deliver a threat and ultimatum to Parr Richey was intended to induce Parr Richey to interfere with Drake's employment or was motivated entirely by a legitimate concern over a conflict of interest with Parr Richey. Thus, we affirm the trial court's conclusion that a genuine issue of material fact precludes the entry of summary judgment on this issue.

### Conclusion

In sum, it is for a jury to weigh the evidence and competing inferences and to determine Duke Realty's intent, including whether Duke Realty intended to interfere with Drake's partnership agreement, whether Duke Realty reasonably contemplated that its threat was certain or substantially certain to interfere with that agreement without regard to whether Duke Realty actually intended or desired that result, or whether Duke Realty's threat to withdraw all of its business from Parr Richey was merely an expression of a client's legitimate concern about a conflict of interest.

Affirmed in part, reversed in part, and remanded for further proceedings.

MATHIAS, J., and BROWN, J., concur.