IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 8, 2020

## KELLY LOVE MCGUFFEY v. BELMONT WEEKDAY SCHOOL ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 15C2811     Kelvin D. Jones, Judge**

_____

### No. M2019-01413-COA-R3-CV

_____

A preschool teacher terminated from her employment at a church preschool brought multiple claims against the church, the school, the director of the school, and a church committee. After the teacher presented her evidence to a jury, the court granted motions for a directed verdict as to all defendants except the church and on all claims except common law retaliatory discharge and promissory estoppel. The teacher claimed that the director terminated her employment in retaliation for her complaints about safety issues at the school and that she relied on a promise by the chair of a church committee that a probation report would be removed from her personnel file. The jury found in favor of the church on both counts, and the trial court entered judgment in favor of the church. We affirm the judgment of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

James W. Edwards, Hendersonville, Tennessee, for the appellant, Kelly Love McGuffey.

H. Rowan Leathers, III, and Sara Anne Quinn, Nashville, Tennessee, for the appellees, Belmont Weekday School, Belmont United Methodist Church, Weekday Children's Ministries Committee, and Jean Voorhees.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Kelly Love McGuffey began working for the Belmont United Methodist Church ("BUMC") in December 2007; BUMC employed Ms. McGuffey as a preschool teacher

at the Belmont Weekday School ("BWS" or "the school"), a licensed child care provider. The director of the school, Jean Voorhees, terminated Ms. McGuffey's employment on February 1, 2015, citing a second supervision violation.

On July 24, 2015, Ms. McGuffey filed a complaint against BWS, BUMC, the Weekday Children's Ministries Committee ("the Committee"), and Ms. Voorhees. Ms. McGuffey alleged, in part, that she raised concerns about the safety of the conditions at the school and received unwarranted discipline as a result of such reports:

> During Plaintiff's employment, Plaintiff reported to Voorhees and Kohler [the School's assistant director] (which were relayed to Voorhees) concerns about School conditions affecting the safety, health and/or wellbeing of children. Voorhees responded by ignoring the conditions, expressing irritation, hostility and threats towards Plaintiff, and imposing disciplinary action based upon false accusations. Voorhees failed to appropriately address these concerns and as a result of her failure there were incidents in which children were exposed to potential danger and/or injury. These incidents, include but are not limited to, the following: (A) Broken Gate to the Littles Playground ("the June 28, 2011 Incident"); (B) Oppressive Heat Conditions on the Littles Playground; (C) the Hazardous Gym Conditions; and (D) Inadequate Evacuation Drill Procedures. Upon information and belief, Defendants knew of these matters as alleged herein, that Voorhees failed to take appropriate action, and that her failure to do so put children at risk of serious injury, harm or death.

The complaint then gives detailed allegations about each of the listed incidents. According to the complaint, after the June 28, 2011 incident, when a child got out of the playground through a faulty gate without a teacher seeing him, Ms. Voorhees "issued a written disciplinary action to [Ms. McGuffey] putting her on probation and falsely accusing her of causing a supervision violation by causing the playground to go out of ratio." The complaint alleges that Ms. Voorhees "did so because [Ms. McGuffey] had repeatedly raised the concern to Voorhees about the broken gate."

During an evacuation drill on January 30, 2015, a child was left in the bathroom in the Nearly-3s classroom (where Ms. McGuffey worked along with another teacher). After this incident, Ms. Voorhees terminated Ms. McGuffey's employment, citing the evacuation drill as her second supervision offense. In her complaint, Ms. McGuffey alleged that "Voorhees would not have terminated [her] . . . but for the fact that [she] raised concerns about safety and health conditions affecting children." Ms. McGuffey asserts that it was her co-teacher, Nora Hoover, who was primarily responsible for supervising the child who was left in the bathroom.

- 2 -

Ms. McGuffey's complaint asserted causes of action against BWS, BUMC, and the Committee for common law retaliatory discharge in violation of public policy, negligent supervision, breach of good faith and fair dealing, and promissory estoppel. She further asserted claims against all of the defendants for libel, slander, and false light invasion of privacy. Ms. McGuffey sought punitive damages. The specific factual allegations underlying each of these causes of action will be discussed more fully below as relevant to the issues presented. Ms. McGuffey filed an amended complaint on August 18, 2015, in which she added a claim for negligent retention (of Ms. Voorhees) against all of the other defendants.

The parties then engaged in discovery and pretrial motions. In June 2017, the defendants filed a motion for summary judgment. In her response to that motion, Ms. McGuffey challenged the constitutionality of Tenn. Code Ann. § 50-1-304, part of the Tennessee Public Protection Act ("TPPA"). On December 29, 2011, the State of Tennessee filed a motion to intervene in the case to defend the constitutionality of the state statute, and the trial court granted the State's motion on January 11, 2018. On March 2, 2018, the trial court granted Ms. McGuffey's motion to file a second amended complaint to add the State of Tennessee as a party defendant and to add a count of statutory retaliatory discharge in violation of public policy pursuant to Tenn. Code Ann. § 50-1-304 against BUMC, BWS, and the Committee, and a count of unconstitutional governmental restriction of plaintiff's fundamental right of free speech against the State.

In an order entered on May 9, 2018, the trial court denied the defendants' motion for summary judgment on all counts with the exception of two—the two claims for breach of the duty of good faith and fair dealing. The court determined that such claims can "only be brought as part of a tort or contract claim." Therefore, the court granted the defendants' motion for summary judgment as to these two counts of the plaintiff's second amended complaint. Pursuant to an order entered on May 14, 2018, Ms. McGuffey voluntarily dismissed her constitutional challenge and the State of Tennessee was dismissed from the lawsuit.

Trial

The case went to trial before a jury over three days. Ms. McGuffey testified that she had made "substantially less" money since losing her job at BWS. In her current position at Christ Church Nashville Day School, she worked fewer hours at a lower hourly rate than she did when she was working at BWS. Ms. McGuffey was continuing her professional training and was working on completing a degree in early childhood education.

Ms. McGuffey stated that she loved working at BWS, but she eventually began to notice unsafe conditions. One problem she identified was the new "little playground":

- 3 -

It seemed like all the tension and problems started when we were made to play on that little playground. At first, it didn't have any awning and no shade out there, and it's completely surrounded by concrete and a parking lot. And then the brick building on the other side, so a lot of the teachers and I would, you know, kind of compare it to a brick oven that the kids had to play in on very -- on Summer days.

According to Ms. McGuffey, she took a thermometer out onto the little playground one day and laid it down on the "smooth surface," where she obtained a reading of 115 degrees. When she showed the thermometer to Ms. Voorhees, the director took the thermometer and went back into the building. Ms. McGuffey acknowledged that she was frustrated by this response. She further testified that, the morning after a teacher passed out on the playground, Ms. Voorhees called the staff together and told them: she (Ms. Voorhees) was tired of hearing complaints about the playground; it was going to be hot out there; and if they did not think they could handle, it they should look for other work.

On cross-examination, Ms. McGuffey acknowledged that there were other options (such as the community center, Parker Hall, and the gymnasium) available to the teachers when they perceived it was too hot to play outside. She was not, however, satisfied with the use of these options. When asked whether the incident when a teacher passed out was due to the teacher's anemia, Ms. McGuffey responded that she did not recall and had not heard the reason for the teacher's passing out. She admitted that her opinion about the teacher's passing out had been speculation.

Another safety issue Ms. McGuffey had concerned the playground gate. She testified:

So you have to lift up on the magnet and push on the bar at the same time. And the magnet—I don't remember if it was the magnet mechanism or the bar, but the gate was not latching tight. You—you could pull it—you could pull it open. And—and I kept telling Ms. Voorhees and Ms. Kohler that the gate wasn't working properly and could they, you know, and they—they assured me that they were going to order the part for it, but they had to wait for the part to come in.

And then one day we went out there to play and a bungee cord was wrapped around it. And [a little girl], who was in our class at the time and her mother was one of the board chairs at the time, pushed through the gate and got her whole little body through it. And I went and told them that's not a fix and it has enough play in it that a small child can push their way through it, and it stayed on there.

Ms. McGuffey estimated that she first observed the problem with the gate a month or two before the incident on June 28, 2011, when a little boy got through the gate.

Ms. McGuffey was questioned about the incident on June 28, 2011, which she testified involved six teachers: the teachers for the two-year-olds, Annie Uselton and Lindsay Noe; the teachers for the toddlers, Kim Turman and Meaghan Love (Ms. McGuffey's daughter); and the teachers for the nearly threes, Ms. McGuffey and Claire Love (Ms. McGuffey's daughter). Ms. Turman and Ms. McGuffey went inside to prepare lunches, so there were four teachers remaining on the playground. Ms. McGuffey stated, "We tried to stagger it enough to make sure we were always in ratio." A child hit his head on the playground and Meaghan came inside to get some ice. Then Meaghan returned and went back outside with the child. When Ms. Turman went outside, Ms. McGuffey heard her say, "Oh, my God." A man and a woman had brought a child back onto the playground. They had found him in the nearby alley and were bringing him back.

Ms. McGuffey testified that, after the incident, she learned that rules promulgated by the Department of Human Services ("DHS" or "the Department") prohibited the toddlers and three-year-olds from being on the playground at the same time every day. She stated that, the morning after the accident, Ms. Voorhees told the staff, "The little boy just got out." That was "the story." If parents had questions, they were to be sent to Ms. Voorhees. Ms. McGuffey stated that, when she suggested walkie-talkies, Ms. Voorhees said there was no money in the budget for them. One of the people who found the child in the alley called DHS.

Susan Jordan, a DHS representative, made a visit to BWS on June 28, 2011. The Department issued a report on July 6, 2011, citing BWS for violations of supervision procedures and rules regarding responsibility for staff training.[1] Ms. McGuffey signed the DHS plan of corrective action on July 6, 2011. She testified that Ms. Voorhees brought the document to her during nap time, which was during her break, for her to sign, and told Ms. McGuffey that she had "caused the playground to go out of ratio." Ms. McGuffey disagreed and did not want to sign the form. Ms. McGuffey further testified:

> And she got very miffed and raised her voice to me and said: "Well, it's—it's just for 90 days and DHS is going to shut this school down if I don't do something. Do you want the school to get shut down and all the teachers to lose their jobs?
>
> And of course, I didn't. I love that school, and I couldn't afford to lose my job. And they were—all the other teachers were my friends. Two

---

[1] On November 21, 2011, DHS issued an order assessing civil penalties against BWS for these two violations.

of them were my daughters. So, of course I signed it after she . . . insisted: "Well, if we don't do something" – that was her words. "If we don't do something, DHS will shut the school down."

And I really trusted her. I took her at her word. . . .

As a result of the playground incident, BWS put Ms. McGuffey on probation. In a supervisory report dated July 8, 2011, Ms. Voorhees stated, in pertinent part:

> Kelly was responsible for playground supervision with other teachers on 6/28/11. When Kelly left the playground to put out lunches, a violation of correct ratio occurred. This is a violation of best practices/supervision and the safety response plan. Therefore, Kelly is being placed on probation. If there is any incident of lapse of supervision by her it will result in immediate termination.

Ms. McGuffey asserts that, prior to the incident, the teachers were instructed to calculate the proper ratios for their own classrooms, whereas they should have been using the age of the youngest child on the playground. Ms. Voorhees required them to set out the lunches for their children.

Asked if it was possible that there was a ratio violation at any time that teachers were coming and going from the playground, Ms. McGuffey responded: "The only way that there might have been a ratio violation would have been if the twos created it." She was sure that "my class and the toddlers were in ratio." After the incident, Ms. McGuffey testified, she asked Ms. Voorhees for the attendance sheets, but none were provided. Ms. McGuffey acknowledged that ratios fall within the area of supervision as set forth in the DHS rules and regulations. She asserted that, because she was fulfilling her responsibility of putting out lunches, she could not be responsible for what happened out on the playground. When asked about when the child managed to get out of the playground, Ms. McGuffey opined that "he must have gotten out in the time between Meaghan coming back with the icepack for James and all of that confusion going on with him being – that's –that's – that's the only time frame I can figure." She admitted that she did not know when he got out of the playground. Ms. McGuffey testified that she had repeatedly complained to Ms. Voorhees and to the church maintenance staff about the gate. She stated that the teachers were trying to be vigilant about safeguarding the gate.

After being put on probation, Ms. McGuffey testified, she sent a memorandum to Mary Uhles, a co-chair of the Committee. It was Ms. McGuffey's understanding that Ms. Uhles was "basically Jean's [Ms. Voorhees's] supervisor." In the memorandum, Ms. McGuffey explained the playground incident and the problems she saw with the school's procedures related to the playground, including the lack of a regular "float" teacher to fill

in when teachers were tending to responsibilities away from the playground. She requested that the probation be expunged from her employment record.

Next, Ms. McGuffey testified about a fire drill conducted on January 30, 2015. She testified that she and her co-teacher, Nora Hoover, were following a policy Ms. McGuffey learned from a previous co-teacher to take turns doing "potty duty." Part of this policy was that the person tending the bathroom was to sit in a chair near the bathroom. Before getting up from the chair the person was to make sure the bathroom was clear. When the alarm sounded, Ms. Hoover was engaged in performing "potty duty," and she was sitting in a chair near the bathroom. Ms. McGuffey was helping the children at the sink to wash their hands. She described the events as follows:

> As soon as the fire alarm went off, shortly after, Nora got up from her chair by the bathroom. And I had—it had been our policy in my classroom that the teacher supervising the bathroom only got up after the last child was done and was—there were no more children in the bathroom. The other teacher was never supposed to get up from that supervisory chair until there were no more children using the bathroom. Nora got up and started to head to the door. And I was still washing the hands of two children, and I told Nora, I said: "I've got these two children. I just need to finish washing their hands"—or drying them or whatever I said. And because it was cold, I didn't want them going out with wet hands. They already couldn't [sic] go out with their jackets.

> And she said: "Okay. I've got the clipboard and the rest—and the other children, and I'm going on out with the rest of the kids."

> And as soon as I finished those two, I turned around, I perused the entire classroom, there were no children in the room, and I went out the door, followed right behind the class, because it didn't take me that long to finish. And by the time we all were out in the hall, some of our kids were up, kind of getting mixed in with the twos class and all trying to crowd through this one little door in a very narrow hallway. . . .

> And they got all the way out to the fence. And when we got all the way to the fence, Nora asked me, she said: We only have nine, right?"

> And I – I just looked at her in disbelief. She had the clipboard. It had the number "10" circled on it, which was my routine to do every morning after the last child had been dropped off. And I said: "No, we have ten."

> And I immediately turned to go back into the building to try to retrieve whichever child was. I was not going to look at all the children to

count. It – it was irrelevant which child it was. It was enough to panic me that the child was left behind in the building.

By this time, everyone had been cleared to reenter the building. When she got back inside, Ms. McGuffey met Ms. Voorhees, who was "holding the hand of one of the little girls in my class."

Based upon a picture of her classroom, Ms. McGuffey testified that, while she was at the sink, she was not able to see a child in the bathroom.[2] According to her reasoning, the moment Ms. Hoover left her position at the snack table (near the bathroom) or in the chair by the bathroom, a supervision violation occurred if a child remained in the bathroom. Ms. McGuffey acknowledged that she was responsible for the safety of the children in her classroom, but she did not understand why she was charged with a supervision offense because she was not able to supervise a child in the bathroom.

After the fire drill incident, both teachers were called into Ms. Voorhees's office to discuss what happened. Ms. McGuffey testified that she began to explain what had taken place, but Ms. Voorhees "cut me off and would not let me explain." Ms. McGuffey gave the following account of her meeting with Ms. Voorhees:

> [S]he goes: "I don't need to hear what happened. I just need to tell you what I've done. I called DCS [Department of Children's Services] and DHS to tell them of the incident, and we're just going to have to wait till they get back to me with their answer on how they want us to handle—how they want me to handle this."

Ms. McGuffey estimated that the meeting lasted "less than five minutes." The fire drill occurred on a Friday; that Sunday, Ms. Voorhees asked Ms. McGuffey to come to the church and gave her a letter informing her that she was terminated effective immediately based on a second supervision offense "that could have resulted in harm to a child."

As to her damages, Ms. McGuffey stated that she did not have medical benefits at her current position or paid personal days. BWC had provided her with full health insurance coverage and a pension, and she accrued a personal day each month. She calculated her total amount of lost wages and benefits at $489,135, based on her working until age 70.

Ms. McGuffey testified that she applied for a position at the Woodmont Christian Preschool after she was terminated at BWC. She thought she had a position there

---

[2] Under Department regulations in effect during the relevant time period, "supervision" was defined to require that a teacher "must be able to hear the child at all times, must be able to see the child with a quick glance and must be able to physically respond immediately." TENN. COMP. R. & REGS. § 1240-04-03-.5.

because the school asked for a background check and fingerprinting after she met with the director, Martha Duff. Ms. McGuffey blamed BMC for depriving her of a position at Woodmont Christian:

A. Because there were documents out there that were public records, and they knew Woodmont – from my understanding from what Ms. Duff and I discussed on my first meeting, she was ready to hire me. And then it was just, like, night and day from the – after I had my fingerprints done and thought I had the position and there were things out there and – in the DHS files, that the first Plan of Corrective Action on the DHS form for the 2015 fire drill was to fire – or terminate Ms. McGuffey's –Ms. – Ms. Love's position at the school – or I don't know the exact wording. But that's the number one thing or that's the first thing you see when you pull out that report.

Q. But you have no idea what –

A. No, I don't. That's – no, I don't know exactly why [sic] their reason, because I did not get a statement from them stating why.

Q. And you don't know what they reviewed or what they –

A. No, I don't.

As to the fire drill incident, Ms. McGuffey testified that she and her co-teacher, Ms. Hoover, had continued a policy Ms. McGuffey learned from a previous co-teacher to take turns doing "potty duty." As she testified, part of this policy was that the person tending the bathroom was to make sure the bathroom was clear before getting up from the chair in front of the bathroom. Ms. McGuffey stated: "I don't deny that I was responsible for the safety of the children in my classroom."

Ms. McGuffey acknowledged that she received high evaluations for her performance as a teacher during her time at BWS. On redirect examination, Ms. McGuffey testified that, at the January 2015 staff meeting, she had brought up that the Monday-Wednesday-Friday children had never experienced a fire drill. Within a few weeks, the Friday fire drill at issue took place.

The plaintiff's next witness was Jennifer Casey, a former BWS parent who testified that she was "very shocked" when she learned that the school had terminated Ms. McGuffey. Ms. Casey had three children at BWS at that time, one of whom was in Ms. McGuffey's class. She stated that Ms. McGuffey "stood out" and "was a great teacher." Asked about her reaction to the email from Ms. Voorhees,[3] Ms. Casey stated that "it was confusing" because she knew Ms. McGuffey and the email "didn't seem to match up with the teacher that I knew." She felt that BWS's decision to terminate Ms. McGuffey seemed "extreme," and she "didn't know what possibly could have happened

---

[3] On February 1, 2015, Ms. Voorhees sent an email to BMS parents with children in Ms. McGuffey's class to inform them that Ms. McGuffey's employment has been terminated.

that – that my child or other children in the classroom were in danger." When asked if she was comfortable with her children being in Ms. McGuffey's class, Ms. Casey responded:

> A. Absolutely. Kelly and – yes. And her daughters continued to babysit for me for years afterwards. So yes, absolutely I felt comfortable with Kelly both when my child was in the classroom and after.
> Q. Was there any reason you feel she was unsafe around children?
> A. No, not at all.

Mary Uhles, who was a co-chair of the Committee during the relevant time period, was unavailable to testify at trial so, by agreement, portions of her deposition were read into evidence. Ms. Uhles testified that she recalled having a conversation with Ms. Voorhees and Brooke Widmer, the other Committee co-chair, in which Ms. Voorhees agreed to remove the probation action from Ms. McGuffey's personnel record.

On cross-examination, the defendants read into the record Ms. Uhles's testimony in which she stated that she was never employed by BWS or BUMC. She served on the Committee, where her role was that of co-chair along with Ms. Widmer. Ms. Uhles testified that she didn't "remember there ever being a defined role on the board[4] for the board when it came to hiring and firing teachers." Ms. Uhles further testified:

> Q. "What about with respect to issues about disciplinary actions and concerns that teachers had about how they were treated at the school. Did the board or you have any role with respect to that?"
> A. "I don't know that there was an official role. But I was friends with a lot of teachers, so I'm sure we talked about things, you know, just anything because I was friends with them for the most part. And – but I didn't have an official role where I was supposed to talk to people and then take their concerns elsewhere."
> Q. . . . "Did you ever tell any of the teachers that if they had a concern, they could raise it with you and you would address it?"
> A. "I was approached by a teacher regarding the incident on the playground where the child got out of the gate, and I listened to what she had to say and then I listened to what the other teachers that were involved had to say."
>   . . . .
> A. "I don't remember ever saying that I would address it."

---

[4] The Committee was also referred to as "the board."

Ms. Uhles recalled that Ms. McGuffey talked to her after the playground incident. Ms. McGuffey did not feel that she should have been disciplined because the child who got out of the playground was not in her class. Ms. Uhles continued:

A. "So it wasn't her understanding that everyone was supposed to be watching out for everybody else, or that she had gone back in to make sure the food was okay. But she wasn't in there, I think, at the time, as I remember."

. . . .

Q. . . . "When you talked to Ms. Voorhees, did you ever address whether or not that disciplinary action should be removed from Ms. McGuffey's record?"

A. "We did."

Q. Line 10. "Question: What did you talk to Ms. Voorhees about?"

A. "I just said after the probationary period is over, it should be removed from all the teachers' records."

Q. Line 15. "Question: And what did Ms. Voorhees say to you in response to that?"

A. "My understanding is that it would be."

Q. Line 18. "Question: Now, did she say that to you? I mean, I want to understand what your understanding is. What is the basis for your understanding?"

A. "I don't remember the entire conversation, but I remember that I felt like if the teachers were going to have this letter in their file, that it would be removed at a certain point and that she agreed to do that."

Q. I'm going to turn to Page 85, Line 1. "Question: Okay. Was there anything that she signed to that effect, Ms. Voorhees signed to that effect?"

A. "I don't remember."

. . . .

Q. Line 6. "Question: Are you aware that each of those teachers who received a disciplinary write-up as a result of the June 2011 incident had a similar Probation Release document in their files?"

A. "I don't remember being aware of that. I don't remember. I just remember being told that their letters had been taken out of the file."

Q. Question, Line 13. "Okay. Was it taken out of the file when the probation had been released?"

A. "I don't – the phrase that I remember is 'taken out of the file.' But I don't remember if I was told that or just in my mind I was like, it was taken out of the file."

After Ms. Uhles's testimony, Ms. McGuffey rested her case.

At the conclusion of Ms. McGuffey's case, the defendants moved for a directed verdict pursuant to Tenn. R. Civ. P. 50 and asked the court to dismiss all of the plaintiff's claims. The trial court granted the motion in part and denied it in part. The court granted the defendants' motion to dismiss BWS and the Committee as party defendants on the grounds that they were part of BUMC. The court also granted the defendants' motion to dismiss Ms. Voorhees as a party defendant to Ms. McGuffey's common law and TPPA retaliatory discharge claims. The trial court denied the defendants' motion to dismiss Ms. McGuffey's common law and retaliatory discharge claims on the basis that she failed to establish that she engaged in whistleblowing activity or on the basis that the plaintiff failed to establish causation. The court granted the defendants' motion to dismiss Ms. McGuffey's claims for negligent supervision, slander and libel, and false light invasion of privacy. It denied the motion to dismiss the plaintiff's claim for promissory estoppel.

The defendants then put on their proof. Ms. Voorhees testified that she had been the director of BWS since 1991 and, in that capacity, was employed by BUMC. She stated that the Committee was a group of parents, some parents with children in BWS and others who are also members of BUMC. According to Ms. Voorhees, the main job of the Committee was to "help fundraise for things that their tuition doesn't cover."

Ms. Voorhees obtained a master's degree in early childhood education and had been working in the field for over 30 years. She described her responsibilities as director at BWS, which included the authority to hire, fire, and discipline teachers. She was supervised by the pastor at BUMC. Like all of the teachers at BWS, Ms. Voorhees was required to and did receive continuing education each year.

Ms. Voorhees stated that she hired Ms. McGuffey in December 2007. At that time, Ms. McGuffey was an experienced preschool teacher. Ms. Voorhees described Ms. McGuffey as a "good teacher" who "took assessment seriously." She acknowledged that Ms. McGuffey brought concerns to her about the playground and other issues. On the playground issue, Ms. Voorhees pointed out that there were "other options for play stations if the temperature was too hot outside." When asked if there was ever an occasion when a teacher came to her saying it was too hot to play outside and Ms. Voorhees did not try to help the teacher find another option, Ms. Voorhees responded: "I can't imagine that." Ms. Voorhees did not recall Ms. McGuffey ever bringing a concern to her about the gate on the little playground. She acknowledged that the gate was changed after the 2011 incident.

Next, Ms. Voorhees was questioned about the fire drill incident. When she was in the process of opening doors to help teachers and children get back into their classrooms, Ms. Voorhees found a little girl standing in Ms. McGuffey's classroom. The little girl had been left in the classroom during the fire drill. Ms. Voorhees testified that she "immediately went to my office and called the Department of Human Services" because there had been "a lapse of supervision." The Department instructed her to call the

Department of Children's Services ("DCS"), too, and DCS directed her to call the child's family to inform them about what had transpired.

After completing these phone calls, Ms. Voorhees called Ms. Hoover to her office. She informed Ms. Hoover about the phone calls to DHS and DCS. Ms. Voorhees further described her meeting with Ms. Hoover as follows:

A. Nora was very visibly upset and was sorry for the child being left in the classroom and, you know, wanted to know what would happen.
Q. Did she accept responsibility, at least from your perception, about what happened?
A. Yes, she did.
Q. Okay. All right. When you were – you were asked about what would happen as a result of that by Ms. Hoover, what did you tell her?
A. I told Ms. Hoover that worst-case scenario, I would have to let her go. In the best case of scenario, you would be on some kind of probation.

Ms. Voorhees then talked to Ms. McGuffey:

A. Ms. McGuffey came into my office next. I told Ms. McGuffey about the steps I had taken, just like I did with Nora, DHS and DCS and I told her that I had called her – her –the child's parents. And Kelly offered excuses to me as to, you know, that she felt hurried –one of them being that she felt hurried, and I – I – I lost my temper. I didn't say anything to Kelly, but I dismissed her to the classroom because I absolutely couldn't believe that she wouldn't accept responsibility that [a child] was left in the classroom.
Q. Did you send her away at that point?
A. Yes, I did.
Q. Okay. Before you sent her away, did you tell her what the consequences might be of what happened?
A. Yes. I said the exact same words I said to Nora: Worse-case scenario I have to let you go; best-case scenario, some kind of probation.

Ms. Voorhees testified that Ms. Hoover had only worked at BWS for about a year at the time of the fire drill incident. Following the incident, she was put on probation for a supervision violation of leaving a child in the classroom. Ms. Voorhees testified that she informed Ms. Hoover that another lapse of supervision would result in the termination of her employment at BWS. Ms. Voorhees stated that she made the decision to terminate Ms. McGuffey's employment at BWS. Her reason was that Ms. McGuffey had previously been put on probation with the condition that "if she had another lapse of supervision, she would be terminated."

Ms. Voorhees was then questioned about the playground incident that occurred on June 28, 2011. The first thing Ms. Voorhees did on the day of the incident was to circulate and discuss with each teacher a memorandum with guidelines on playground supervision; each teacher signed the document. Ms. Voorhees stated that it took "until the middle or the end of the next week" for her to find out what she needed to know about the incident.

Ms. Voorhees decided that write-ups needed to be issued concerning the incident and she wrote up all six of the teachers who were on the playground that day. She testified that all of the write-ups were similar to that of Ms. McGuffey; each teacher was advised that any further incident would lead to termination. After ninety days in which a teacher had successfully completed the mandated ratio checks, the teacher was released from probation. The release of probation was then placed in each teacher's personnel file. As to Ms. McGuffey's write-up, Ms. Voorhees testified that she cited Ms. McGuffey for failure to maintain the correct ratio, which was a supervision violation, and placed her on probation. The write-ups of the other teachers were substantially the same. She further advised Ms. McGuffey in the write-up that any further supervision lapse would result in her termination. The school was required by DHS to provide it with a plan of corrective action showing the actions the school had taken since the child escaped from the playground.

Ms. Voorhees testified that she terminated Meaghan Love's and Ms. Turman's employment at BWS for a second supervision violation during a fire drill in March 2015. The incident in March 2015 involved a child being accidentally left behind a locked door for several minutes while the teachers rushed to get to the child.

Counsel for the defense asked Ms. Voorhees whether Ms. McGuffey's reports and complaints about safety issues at BWS formed "any part of the basis" of her decision to terminate Ms. McGuffey's employment at BWS. Ms. Voorhees responded:

A. Absolutely not.
Q. What did?
A. The supervision of . . . , the child that was left in the classroom.
Q. Okay. Now, that was her second offense?
A. Correct.
Q. The first offense occurred back in 2011, correct?
A. Correct.
Q. And were those the reasons that you made the decision to terminate her employment?
A. Yes, that was why Kelly was terminated.
Q. And each of the teachers that had a child on the playground on June 28, 2011 who had a second supervision offense – offense, they were all terminated, weren't they?

- 14 -

A. Correct.

On cross-examination, Ms. Voorhees was asked why she did not allow Ms. McGuffey to appeal her termination. She responded that the decision was taken out of her hands by BUMC.

Ms. Voorhees testified that, prior to the playground incident in June 2011, no one had alerted her that there was a bungee cord on the playground gate. Asked about the asserted supervision violation committed that day by Ms. McGuffey, Ms. Voorhees stated that "[h]er absence from the playground meant that there were not enough teachers watching the children." She admitted that BWS no longer had the attendance sheets for that day, but she had no memory of Ms. McGuffey requesting the attendance sheets after the incident.

Ms. Voorhees admitted that she did not notify the Department about the incident on the day that the playground incident occurred, or even the day after. In fact, she never notified the Department. She stated: "I did not know I was supposed to call DHS." It was a third party (one of the people who found the child in the alley) who contacted DHS. Ms. Voorhees acknowledged that she was not present at the school when Ms. Jordan (from DHS) visited and wrote out the plan of corrective action with Ms. McGuffey.

At the time of trial, Ms. Voorhees testified that the children from each classroom played outside without interacting with children from any other class "as a result of June the 28th." Prior to the June 28 incident, the three classrooms did play together on the playground. Ms. Voorhees "felt like the multiage group was allowed." She acknowledged, however, that the DHS rules actually provided that "all three classrooms should not have been playing on the playground together" because of the different ages. Ms. Voorhees admitted that the school's previous practice was in violation of DHS rules. She testified that the "June the 28th incident of losing the little boy made us change a lot of things at the Weekday School."

Ms. McGuffey's attorney questioned Ms. Voorhees about her handling of Ms. Turman's termination for a supervision offense during a fire drill on March 4, 2015. As Ms. Voorhees described the incident, a fire drill occurred during nap time and, as the children were leaving the toddler room, the door slammed with a child trapped behind it. Ms. Turman knew the child was there and was able to get to the child almost immediately. Ms. Voorhees made an initial determination that the incident did not need to be reported. She further testified:

Q. Can you quote the supervision rule again for us?
A. Yes, sir, I can. "Children must be heard at all times, seen at a quick glance and be able to get to quickly."

- 15 -

Q. Was anybody able to see that child?
A. No, sir, they were not.
Q. Then why did you conclude that it was not a supervision offense?
A. Because I felt like that the staff got to the child as quickly as they could. She – they knew that the door had shut, and they knew where she was.
Q. Tell me in time how quickly they got to her.
A. In less than a minute. They're running in the building as fast as they can.
Q. Did you – did you put on the DHS report with respect to Ms. McGuffey that the child in her room was probably by herself for less than a minute?
A. Yes, sir. I was advised by the DHS intake person to put that down, because I had answered to her when I made the initial phone call that I didn't know how long the child was by herself.
Q. But you put on the DHS report it was less than a minute?
A. Yes, sir.

Ms. Voorhees terminated Ms. Turman's employment at BWS over a month after the fire drill incident at which she committed a supervision violation.

Ms. McGuffey's counsel asked Ms. Voorhees if, after the June 28, 2011 incident, she had a conversation with Ms. Uhles about removing Ms. McGuffey's probation report from her personnel file. Ms. Voorhees denied that any such conversation had ever occurred. She testified that she would not remove documents from an employee's personnel file.

On redirect examination, Ms. Voorhees clarified that she saw a difference between the January 30, 2015 fire drill and the March 4, 2015 fire drill because no one forgot where a child was on March 4.

The next defense witness was Martha Duff, the director at Woodmont Christian Preschool, who was under a subpoena to testify. She stated that Ms. McGuffey had come to her office a few years earlier and brought a copy of her resume. There was no position available at that time. Ms. Duff recalled a paragraph on the second page of Ms. McGuffey's resume about her termination from employment at BWS and how Ms. McGuffey felt that she had been treated unfairly. Ms. Duff kept the resume on file for about a year. She testified that, once she did have a position available, she probably had a hundred good resumes and hired someone with better qualifications.

Ms. Duff denied ever doing any fingerprinting with Ms. McGuffey. She would only have done that with someone with whom she had a contract. She commented that Ms. McGuffey was personable but did not have as much education as most of the teachers Ms. Duff hired.

- 16 -

Ena Shea Kohler, who was at the time of trial an assistant director at BWS, testified that her three children went to the school and one of them had been in Ms. McGuffey's class. She thought that Ms. McGuffey was a good teacher for her son. Ms. Kohler was involved with the Committee when her children attended BWS and acted as the chair for five years. Before becoming the assistant director, she worked as a substitute teacher, then a regular teacher, and the curriculum coordinator. Ms. Kohler taught with Ms. McGuffey for the first five weeks Ms. McGuffey was at the school.

Ms. Kohler testified about the June 2011 playground incident. She was not at the school when the January 2015 fire drill occurred, but Ms. Voorhees consulted with her about the event and she concurred with Ms. Voorhees's proposed action because "both teachers were responsible for the children in the classroom." Ms. Kohler was also questioned about the fire drill on March 4, 2015. She was the person who made the initial determination that there was no supervision violation because Ms. Kohler "knew where the child was." Ms. Kohler subsequently learned that her determination was incorrect. All three teachers involved in the classroom were written up for a supervision violation, and that violation resulted in the termination of two of the teachers.

Ms. Kohler testified that Ms. McGuffey and other teachers complained to her about a problem with a gate on the little playground. She was aware that the church kept a supply of extra latches for that gate.

On cross-examination, Ms. Kohler stated that Kelly McGuffey called DHS about the supervision violations during the March 4, 2015 fire drill.

Ms. Hoover, Ms. McGuffey's co-teacher on the day of the fire drill, testified that she worked at BWS for nine months. Ms. Hoover stated that, at the time of the fire drill, Ms. McGuffey was in charge of the classroom because she was the lead teacher. When asked whether she was supervising children using the restroom before the alarm sounded, Ms. Hoover replied that she did not think so, but she did not remember. As soon as they lined the children up against the fence and counted them, Ms. Hoover realized there were only nine and she told Ms. McGuffey they were missing a child. When they reentered the building, they saw Ms. Voorhees standing with the missing child.

Ms. Hoover spoke with Ms. Voorhees about the incident later that day. Ms. Voorhees asked Ms. Hoover to recount what happened. She recalled that Ms. Voorhees told her that she had reported the incident to DCS or DHS (she could not recall which agency). She could not estimate how long the meeting took and could not remember much about what was said because she was upset. Ms. Voorhees called Ms. Hoover the following Sunday and informed her that Ms. McGuffey would not be returning to BWS and that Ms. Hoover would be back in the same classroom with another teacher and would be on probation.

- 17 -

Ms. McGuffey called her husband, Patrick McGuffey, and BUMC's pastor as rebuttal witnesses. At the conclusion of all of the evidence, BUMC, the remaining defendant, moved for a directed verdict with respect to all of the remaining claims. The trial court granted the motion in part and denied it in part. The court granted BUMC's motion with respect to the claim for punitive damages and the TPPA retaliatory discharge claim. The court denied the motion with respect to the promissory estoppel and common law retaliatory discharge claims. The trial court then charged the jury with respect to the two remaining claims.

The jury reached a unanimous verdict as follows:

Plaintiff failed to prove by a preponderance of the evidence that a substantial factor in her discharge was her speaking out about illegal activities if an important public policy interest of the state has been embodied in the law (Question 1, Retaliatory Discharge, Jury Verdict Form); and

Plaintiff failed to prove by a preponderance of the evidence that Defendant Belmont United Methodist Church made a clear, definite, and unambiguous promise to her that her probation would be removed from her record and that no future disciplinary action or termination would be taken against her on the basis of it (Question 4, Promissory Estoppel, Jury Verdict Form).

Based upon this verdict and its rulings during the trial, the trial court entered a final judgment on January 16, 2019, dismissing all of the claims in Ms. McGuffey's second amended complaint.

Ms. McGuffey filed a motion to alter or amend or to grant a new trial or, in the alternative, "for a memorandum opinion setting forth the legal grounds for the court's rulings of certain directed verdict rulings." On July 9, 2019, the trial court entered an order denying the plaintiff's motion. This appeal followed.

On appeal, Ms. McGuffey presents the following issues:

1. Whether the trial court applied the proper legal standard in granting directed verdicts to the defendants pursuant to Tenn. R. Civ. P. 50.
2. Whether the trial court's failure to submit the plaintiff's claims for defamation[5] to the jury violated Article 1, Section 6 of the Tennessee Constitution.

_____

[5] Although the plaintiff's statement of the issues includes additional counts with respect to this issue, her argument addresses only the defamation count.

3. Whether the trial court's dismissal of the plaintiff's claims by directed verdict had the constructive effect of removing the remaining counts from the province of the jury, thereby violating the plaintiff's constitutional right to a jury trial under Article 1, Section 6 of the Tennessee Constitution.

4. Whether the trial court erred when it failed to provide findings of fact and conclusions of law in support of its directed verdict rulings as requested by the plaintiff in her post-judgment motion and as required by Tenn. R. Civ. P. 52.01.

ANALYSIS

I. Propriety of directed verdicts.

Ms. McGuffey asserts that the trial court failed to apply the proper legal standard in granting directed verdicts and that she presented sufficient evidence to create an issue for the jury.

The standard for "review of a trial court's decision to grant [or deny] a directed verdict is well-settled." *Harper v. Churn*, 83 S.W.3d 142, 146 (Tenn. Ct. App. 2001). A directed verdict is proper "when the evidence is susceptible to only one conclusion." *Id.* We must "review the record to determine whether [the plaintiff's] evidence was sufficient to create an issue for the jury to decide." *Spann v. Abraham*, 36 S.W.3d 452, 462 (Tenn. Ct. App. 1999). In our review, "we do not weigh the evidence or evaluate the credibility of the witnesses." *Id.* (citations omitted). We consider "the evidence most favorably to the party opposing the motion, give that party the benefit of all reasonable inferences from the evidence, and also disregard all evidence contrary to that party's position." *Id.* (citing *Eaton v. McLain,* 891 S.W.2d 587, 590 (Tenn. 1994), and *Gann v. Int'l Harvester Co.,* 712 S.W.2d 100, 105 (Tenn. 1986)); *see also Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000). The court must deny the motion "[i]f there is any doubt as to the proper conclusions to be drawn from the evidence." *Eaton*, 891 S.W.2d at 590 (citing *Crosslin v. Alsup,* 594 S.W.2d 379, 380 (Tenn. 1980)). Conclusions drawn from the facts "must be based on more than speculation, conjecture, and guesswork." *Spann*, 36 S.W.3d at 462 (citing *Daniels v. White Consol. Indus., Inc.,* 692 S.W.2d 422, 425 (Tenn. Ct. App. 1985)).

As outlined above, the trial court granted directed verdicts with respect to a number of Ms. McGuffey's claims and with respect to several defendants. In her brief on appeal, however, Ms. McGuffey challenges the trial court's granting of a directed verdict only as to the following causes of action: (A) defamation: both libel and slander, (B) false light invasion of privacy, (C) negligent supervision/retention of Ms. Voorhees, and (D) punitive damages. As to all of the remaining directed verdicts, we consider Ms.

McGuffey to have waived all issues by her failure to raise or brief any of those issues on appeal. *See* TENN. R. APP. P. 27.; *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000).

A. Defamation—libel and slander.

Did Ms. McGuffey present sufficient evidence to make out a prima facie case of defamation--libel or slander?

A directed verdict is proper when a "plaintiff's evidence fails to establish a prima facie case." *Spann*, 36 S.W.3d at 462. The elements of a prima facie case of defamation in Tennessee are: (1) the defendant published a statement with (2) "knowledge that the statement is false and defaming" to the plaintiff, or with "reckless disregard for the truth of the statement," or "negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999) (citing RESTATEMENT (SECOND) OF TORTS § 580 B (1977), and *Press, Inc. v. Verran,* 569 S.W.2d 435, 442 (Tenn. 1978)). In this context, "'[p]ublication' is a term of art meaning the communication of defamatory matter to a third person." *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.,* 876 S.W.2d 818, 821 (Tenn. 1994); *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013). With slander, "'publication' occurs when the defamatory matter is spoken." *Brown*, 428 S.W.3d at 50.

This court has previously held:

> "For a communication to be libelous, it must constitute a serious threat to the plaintiff's reputation. A libel does not occur simply because the subject of a publication finds the publication annoying, offensive or embarrassing. The words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule. They must carry with them an element 'of disgrace.'"

*McWhorter v. Barre*, 132 S.W.3d 354, 364 (Tenn. Ct. App. 2003) (quoting *Stones River Motors, Inc. v. Mid-South Publ'g Co., Inc.,* 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983)). Moreover, the damaging words must be false; "[i]f [the words] are true, or essentially true, they are not actionable, even though the published statement contains other inaccuracies which are not damaging." *Stones River*, 651 S.W.2d at 719; *see also Brown*, 428 S.W.3d at 50. The determination of "[w]hether a communication is capable of conveying a defamatory meaning" presents a question of law and is, thus, reviewed de novo. *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000).

In the present appeal, Ms. McGuffey relies upon the following alleged instances of libel or slander:

A. An email sent to BWS parents with children in Ms. McGuffey's class on February 1, 2015. The email included the following statement: "[Ms. McGuffey] will not be working for Belmont Weekday School any longer due to a supervision mistake during a fire drill."

B. A letter sent to BWS parents with children in Ms. McGuffey's class on February 5, 2015. The letter included the following statement: "Based on the information presented, the Board agreed that Jean [Voorhees] was making the best decision for the welfare of the children and the school. We commended Jean for self-reporting this lapse in supervision to the appropriate authorities."

C. A statement by Ms. Voorhees at a school staff meeting on February 2, 2015. She stated: "We are all human and we make mistakes but just as a surgeon cannot make mistakes, neither can we when it comes to the supervision of children."

D. A supervisory report provided by BWS to DHS that resulted in that agency's evaluation stating that "Ms. [McGuffey] is no longer employed" by BUMC.

At trial, Ms. McGuffey identified the first statement (the February 1, 2015 email) as defamatory, but failed to identify the other three communications. The burden of proof is on the plaintiff to establish the elements of the prima facie case of defamation, which include establishing that there was a defamatory statement. *Sullivan*, 995 S.W.2d at 571. The plaintiff points to a trial binder containing 81 stipulated exhibits, including the communications at issue, as being sufficient to make out her case. Without the plaintiff further identifying the statements she considered defamatory, we cannot find that the plaintiff sufficiently met her burden of proof as to the remaining three communications (other than the February 1, 2015 email).[6]

As to the February 1, 2015 email to BWS parents, the defendants argue that the email was not published because it was conditionally privileged. A conditional, or qualified, privilege exists "where the interest which the defendant is seeking to vindicate or further is regarded as sufficiently important to justify some latitude for making mistakes." *Pate v. Serv. Merch. Co., Inc.*, 959 S.W.2d 569, 575-76 (Tenn. Ct. App. 1996) (citing W. Page Keeton et al., PROSSER & KEETON ON THE LAW OF TORTS, § 115, at 825 (5th ed. 1988)). Our Supreme Court has described the communications covered by a conditional privilege as follows:

Qualified privilege extends to all communications made in good faith upon any subject-matter in which the party communicating has an interest, or in

---

[6] The defendants do not contend on appeal that the statements at issue are not defamatory.

- 21 -

reference to which he has a duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation. . . . The rule announced is necessary in order that full and unrestricted communication concerning a matter in which the parties have an interest or a duty may be had. It is grounded in public policy as well as reason.

*S. Ice Co. v. Black*, 189 S.W. 861, 863 (Tenn. 1916) (internal citations omitted); *see also Trotter v. Grand Lodge F. & A.M. of Tenn.*, No. E2005-00416-COA-R3-CV, 2006 WL 538946, at *7 (Tenn. Ct. App. Mar. 6, 2006); *Pate*, 959 S.W.2d at 576. Tennessee courts have recognized a common interest privilege as one type of conditional privilege. *See Certain v. Goodwin*, No. M2016-00889-COA-R3-CV, 2017 WL 5515863, at *7 (Tenn. Ct. App. Nov. 17, 2017). In Tennessee, the common interest privilege has been applied to "communications between employees or agents of the same business or corporation." *Id.*, at *8; *Tate v. Baptist Mem'l Hosp.*, No. W1999-00553-COA-R3-CV, 2000 WL 1051851, at *5 (Tenn. Ct. App. July 28, 2000); *Pate*, 959 S.W.2d at 576. (Thus, BWS's communications with its teachers would be covered under the common interest privilege.)

Although we are not aware of a Tennessee case holding that a school's communications with the parents of its students would fall under the common interest privilege, the reasoning underlying the privilege would support its application to communications with the parents. Parents have an interest in staffing decisions regarding the persons taking care of their children. In fact, DHS regulations in effect at the time of Ms. McGuffey's termination required child care agencies to communicate with parents regarding staff changes.[7] In *Gatto v. St. Richard School, Inc.*, 774 N.E.2d 914, 924-25 (Ind. Ct. App. 2002), a defamation suit involving statements made by a school in a letter to parents about a teacher's termination, the court stated:

Parents and schools have a "corresponding interest" in the free flow of information about administrators and faculty members. We are in agreement with many of our sister states that have recognized the common interest privilege under similar circumstances.

We are in agreement with the court in Indiana and other states where the common interest privilege has been applied to school communications with parents. *See Gatto*,

---

[7] Tenn. Comp. R. & Regs. § 1240-04-03-0.59(6)(d) provided: "The agency shall implement a plan for regular and ongoing communication with parents. This plan shall include but not be limited to communication concerning . . . changes in personnel, or planned changes affecting children's routine care." This section was subsequently repealed.

774 N.E.2d at 925 n.4 (listing other state decisions where the common interest privilege was applied to communications between a school and its students' parents).

When a statement falls under a conditional privilege, the plaintiff must prove actual malice in order for the privilege to be lost. *McWhorter*, 132 S.W.3d at 365. Ms. McGuffey asserts that the common interest privilege does not apply here because she presented evidence that Ms. Voorhees made the statement with malice. We must, then, consider what actual malice means in this context.

> The concept of actual malice in defamation cases connotes more than personal ill will, hatred, spite, or desire to injure. Rather, it is limited to statements made with knowledge that they are false or with reckless disregard to their truth or falsity. Determining whether a defendant acted with reckless disregard requires the finder of fact to determine whether the defendant "in fact entertained serious doubts as to the truth of his [or her] publication."

*Tomlinson v. Kelley*, 969 S.W.2d 402, 405-06 (Tenn. Ct. App. 1997) (quoting *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 75 (Tenn. Ct. App. 1986)) (internal citations omitted).

The statement at issue here is the following: " [Ms. McGuffey] will not be working for Belmont Weekday School any longer due to a supervision mistake during a fire drill." Ms. McGuffey's argument is that "[t]he publication of this information was intentional, reckless, and malicious because (1) the email was issued only minutes after Ms. McGuffey was fired and (2) no investigation was performed to establish the validity of the email's contents." Ms. McGuffey's brief on these points consists primarily of conclusory statements that are not supported by facts in the record.[8] She states: "There is no evidence in the record of an investigation by any official of BUMC of the so called second offense to ascertain its truthfulness." Ms. Voorhees testified that she interviewed both Ms. Hoover and Ms. McGuffey after the fire drill incident. (She admitted that she cut her meeting with Ms. McGuffey short because she did not want to lose her temper.) Based upon the lack of investigation, Ms. McGuffey finds "clear and convincing evidence of [BUMC's] recklessness." We note that Ms. McGuffey was an at-will employee, and Ms. Voorhees had the authority to terminate her employment.[9] BUMC

---

[8] Many of the arguments in this section of Ms. McGuffey's brief relate to the other three statements alleged to be defamatory and, because we have already eliminated the other three statements as not being identified by the plaintiff at trial, we need not address these arguments.

[9] Under Tennessee law, "an employee-at-will generally may not be discharged for attempting to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 (Tenn. 1997). The jury rejected Ms. McGuffey's retaliatory discharge claim.

was not, therefore, required to provide Ms. McGuffey with an appeal or to investigate Ms. Voorhees's decision.

The burden of proof was upon Ms. McGuffey to show that the communication at issue was made with actual malice—that Ms. Voorhees knew it was false or had reckless disregard as to the truth or falsity of the statement that Ms. McGuffey would not be working for BWS any longer due to a supervision error during a fire drill. Her real disagreement concerns what constitutes a supervision violation under the pertinent regulations, but it is not necessary to engage in that argument. Ms. McGuffey does not point to any evidence that Ms. Voorhees did not send the email at issue in good faith. She charges that Ms. Voorhees "knew that there was no basis for the alleged first offense," referring to the playground gate incident in June 2011. However, the pages of the transcript Ms. McGuffey cites to support this statement describe Ms. Voorhees's actions in calling DHS immediately after the fire drill incident in January 2015.

Finally, even if we were to find sufficient evidence of publication, Ms. McGuffey failed to prove she suffered damages. To make out a claim for defamation, a plaintiff must prove that "the defamation resulted in injury to the person's character and reputation." *Brown*, 428 S.W.3d at 50. In a defamation suit, damages cannot be presumed; rather, a plaintiff must sustain and prove actual damages. *Id.* at 51 (citing *Davis v. The Tennessean,* 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001)). As to damages, "'the issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering.'" *Id.* (quoting *Murray v. Lineberry,* 69 S.W.3d 560, 564 (Tenn. Ct. App. 2001)).

In her brief, Ms. McGuffey makes the statement that the February 1, 2015 email contained words "suggesting that she is unsafe to supervise small children," thereby damaging her reputation as a teacher of small children. She further states that the damage to her reputation is "quite evident in the testimony of parent Jennifer Casey who testified that she was shocked by the action," referring to BWS's termination of Ms. McGuffey. As the defendants point out, however, Ms. Casey testified that Ms. McGuffey and her daughters continued to babysit for Ms. Casey after the termination of Ms. McGuffey's employment at BWS. When asked if she trusted Ms. McGuffey, Ms. Casey responded, "Absolutely I felt comfortable with Kelly [McGuffey] both when my child was in the classroom and after." Thus, Ms. McGuffey failed to establish that the statement at issue actually caused harm to her reputation and standing in the community. Reduced earnings alone is not sufficient.

---

In the absence of some violation of a clear public policy, an employer may terminate an at-will employee for any reason. *Id.*

The trial court did not err in granting a directed verdict on the claims for defamation.

B.  False light invasion of privacy.

Ms. McGuffey next asserts that the statements listed in regard to defamation were sufficient to create an issue of fact on her claims for false light invasion of privacy.  We respectfully disagree.

Our Supreme Court has adopted the following definition of the tort of false light invasion of privacy:

> "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

*West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 644 (Tenn. 2001) (quoting RESTATEMENT (SECOND) OF TORTS § 652E (1977)).  In *West*, the Court "departed from the Restatement by stating that Tennessee does not require a plaintiff asserting a false light cause of action to prove actual malice unless the plaintiff is a public official or public figure." *Loftis v. Rayburn*, No. M2017-01502-COA-R3-CV, 2018 WL 1895842, at *7 (Tenn. Ct. App. Apr. 20, 2018).  A private plaintiff must also show actual malice when asserting a claim concerning "a matter of public concern." *West*, 53 S.W.3d at 647; *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 303 (Tenn. Ct. App. 2007).

We have concluded that Ms. McGuffey's false light claims fail for much the same reasons as her defamation claims.  As to all but one of the communications, she failed to identify the communication alleged to be a violation of her privacy at trial and, therefore, failed to establish a key element of her claim.  We are left with the statement made in the February 1, 2015 email sent to parents after Ms. McGuffey's termination.   Our Supreme Court has stated that the absolute and conditional privileges apply to false light claims. *West*, 53 S.W.3d at 648.  Thus, the reasoning discussed above with respect to defamation and the common interest privilege applies with respect to the false light claim.  Furthermore, Ms. McGuffey has failed to establish the element of damages necessary for a claim of false light invasion of privacy.  For such a claim, she was required to show evidence of "injury to standing in the community, humiliation, or emotional distress."

*West*, 53 S.W.3d at 648. In her argument regarding her false light claim, Ms. McGuffey asserts that the statements at issue "would make it difficult for her to secure employment in her field." Although she presented evidence of her earnings after her termination from employment at BWS, she did not substantiate a loss of standing in the community, humiliation, or emotional distress.[10]

Thus, the trial court did not err in granting a directed verdict with respect to this claim.

### C. Negligent supervision/retention.

Ms. McGuffey next asserts that the trial court erred in granting a directed verdict on her claim for BUMC's negligent retention/supervision of Ms. Voorhees as an employee.

In making her argument, Ms. McGuffey turns to the Restatement of Employment Law, which provides that, with some exceptions, "an employer is subject to liability for the harm caused an employee by negligence in selecting, retaining, or supervising employees or agents whose tortious acts resulted in the harm." RESTATEMENT OF EMPLOYMENT LAW § 4.04 (Oct. 2019). Under Tennessee law, a plaintiff "'may recover for negligent hiring, supervision or retention of an employee if he establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness of the job.'" *Bazemore v. Performance Food Grp., Inc.*, 478 S.W.3d 628, 638-39 (Tenn. Ct. App. 2015) (quoting *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008)).

---

[10] As we noted in a previous case, the damages in defamation and false light cases are intended to remedy different injuries:

> Still, it has been observed that there is "significant and substantial overlap between false light and defamation." *Jews For Jesus, Inc. v. Rapp,* 997 So. 2d 1098, 1113 (Fla. 2008). *See also* Patricia Avidan, *Protecting the Media's First Amendment Rights in Florida: Making False Light Plaintiffs Play by Defamation Rules,* 35 STETSON L. REV. 227, 238 (2005) ("Many commentators and courts cite the fact that plaintiffs may allege false light based on true statements as a major distinguishing factor between defamation and false light. This distinction blurs, however, in jurisdictions such as Florida, where courts recognize defamation by implication.") The main distinction appears to be in the injury to be addressed. "[I]n defamation cases the interest sought to be protected is the objective one of
>
> reputation, either economic, political, or personal, in the outside world. In privacy cases the interest affected is the subjective one of injury to [the] inner person." *West*, 53 S.W.3d at 645-46.

*Eisenstein v. WTVF-TV, News Channel 5 Network, LLC*, 389 S.W.3d 313, 318 n.5 (Tenn. Ct. App. 2012).

Even if she could identify a tortious act committed by Ms. Voorhees, Ms. McGuffey has presented no evidence that BUMC knew Ms. Voorhees was unfit for her job. Ms. McGuffey quotes the glowing evaluations of the supervising pastor in November 2015 concerning Ms. Voorhees's "excellent leadership skills" and ability to "communicate[] effectively with parents." During the review, the pastor stated: "[Ms. Voorhees] has navigated some troubled waters this year and we are grateful for her steady and constant leadership." Based upon the pastor's reference to "troubled waters," Ms. McGuffey surmises that "the church knew the extent of Ms. Voorhees['s] behavior in her supervision and firing of appellant McGuffey." Ms. McGuffey further notes that, when asked about whether he had any concerns about Ms. Voorhees in November 2014, the pastor responded: "None."

In Ms. McGuffey's view, the evaluations indicate that BUMC was "allowing [Ms. Voorhees] to operate in a manner that resulted in tortious behavior towards Ms. McGuffey" and the church's failure to discipline Ms. Voorhees "rais[es] the question of negligent supervision." These conclusions are the result of conjecture and speculation. Ms. McGuffey fails to point to any evidence that BUMC had knowledge that Ms. Voorhees was unfit for her job.

D. Punitive damages.

Finally, Ms. McGuffey argues that the trial court erred in granting a directed verdict at the conclusion of all of the proof on her claim for punitive damages.

To be entitled to punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant "acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). To meet the clear and convincing evidence standard, evidence must "leave[] 'no serious or substantial doubt about the correctness of the conclusions drawn.'" *Goff v. Elmo Greer & Sons Constr. Co., Inc.*, 297 S.W.3d 175, 187 (Tenn. 2009) (quoting *Hodges*, 833 S.W.2d at 901 n.3). Punitive damages are intended to punish and deter similar future wrongs and "are available in 'cases involving only the most egregious of wrongs.'" *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 849 (Tenn. 2010) (quoting *Hodges*, 833 S.W.2d at 901).

In her brief, Ms. McGuffey states the following basis for her alleged entitlement to punitive damages: "There is ample clear and convincing evidence that Appellant presented evidence that Jean Voorhees acted intentionally, she acted recklessly, and she acted maliciously when she made written and oral defamatory statements about Ms. McGuffey." Thus, she seeks punitive damages for Ms. Voorhees's alleged defamatory statements. As we have previously concluded that the trial court did not err in granting a directed verdict as to Ms. McGuffey's claims for defamation, we likewise conclude that

the trial court did not err in granting a directed verdict as to her claims for punitive damages.

II.  Right to jury trial on defamation.

Ms. McGuffey argues that the trial court deprived her of her constitutional right to a trial by jury under Article I, Section 6 of the Tennessee Constitution by granting a directed verdict on her defamation claims.  We disagree.

As Ms. McGuffey states, Article I, Section 6 of the Tennessee Constitution protects the right to trial by jury as it existed at common law at the time of adoption of the Constitution.  *Harbison v. Briggs Bros. Paint Mfg. Co.*, 354 S.W.2d 464, 467-68 (Tenn. 1962).  There is no dispute that defamation is a tort for which one had a right to trial by jury at common law.  It does not, however, follow that a trial court lacks the authority to grant a directed verdict during a jury trial in a proper case.  The province of the jury is to decide issues of fact.  *See Harbison*, 354 S.W.2d at 469 ("Another incident of common law trial by jury is the separation of function by which the jury tries disputed issues of fact; and the judge, matters of law and all other questions.").  As discussed above, a directed verdict is appropriate "when the evidence is susceptible to only one conclusion."  *Harper*, 83 S.W.3d at 146.  The court must determine "whether [the plaintiff's] evidence was sufficient to create an issue for the jury to decide."  *Spann*, 36 S.W.3d at 462.  If there are no factual issues for the jury to decide, there is no violation of Article I, Section 6 when the court grants a directed verdict.  *See Biltcliffe v. Hailey's Harbor, Inc.*, No. M2003-02408-COA-R3-CV, 2005 WL 2860164, at *3 (Tenn. Ct. App. Oct. 27, 2005).

We find no merit in Ms. McGuffey's constitutional argument here.

III.  Directed verdicts as effective removal of entire case from jury.

Ms. McGuffey asserts that the trial court's granting of directed verdicts on all but two counts (common law retaliatory discharge and promissory estoppel) and as to all but one defendant had the effect of "gut[ting] [Ms. McGuffey's] wrongful termination complaint" and "was an indicator [to the jury] that her case was weak." The jury's perception of the strength or weakness of Ms. McGuffey's case is not a factor this court can consider in determining whether the trial court properly granted a directed verdict on a given claim.  As previously discussed, the trial court properly determined that, with respect to the causes of action raised on appeal, there was insufficient evidence to send the case to the jury.

Ms. McGuffey likens this case to the facts in *Harbison*, where the court presented the jury with a single interrogatory and instructed the jury that, depending on its answer, the case would either be concluded or there would be additional questions for the jury to

answer. *Harbison*, 354 S.W.2d at 471. The court in *Harbison* concluded that the interrogatory approach was not harmless error because the "plaintiff had a constitutional right to have all the issues of fact submitted to the same jury at the same time." *Id.* at 471-72. The present case is not analogous to *Harbison* because there were no factual issues for the jury to decide on any of the claims except for the two that went to the jury.

We find no merit in Ms. McGuffey's argument here.

IV. Findings of fact and conclusions of law.

After the trial court entered judgment on the jury's verdict, Ms. McGuffey filed a motion requesting, in part, a memorandum opinion setting forth the legal grounds to support its rulings granting directed verdicts dismissing Ms. Voorhees, the Committee, and BWS, and dismissing the claims for libel, slander, false light invasion of privacy, negligent supervision, and punitive damages. The trial court denied the motion. On appeal, Ms. McGuffey assigns error to this denial.

Tennessee Rule of Civil Procedure 52.01 provides:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. *Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rules 41.02 and 65.04(6).*

(Emphasis added). Tennessee Rule of Civil Procedure 50.01, which addresses motions for directed verdict, does not require findings of fact and conclusions of law. Moreover, Tenn. R. Civ. P. 52.01 provides that "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion" with some exceptions not applicable here. *See also Green v. Champs-Elysees, Inc.*, No. M2012-00082-COA-R3-CV, 2013 WL 10481171, at *6-7 (Tenn. Ct. App. Sept. 11, 2013).

We find no merit in this argument.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Kelly Love McGuffey, and execution may issue if necessary.


_____
ANDY D. BENNETT, JUDGE